## AGREEMENT FOR USE OF CASH COLLATERAL, ASSUMPTION OR REJECTION OF CONTRACTS, POST-PETITION FINANCING AND RELIEF FROM THE AUTOMATIC STAY

This agreement is entered into between The Urban Farmer, Inc. ("Urban Farmer"), debtor/debtor-in-possession,) and United Fire & Casualty Company ("Surety"). This agreement addresses the use of cash collateral generally and the segregation of cash collateral from Urban Farmer contracts with Obligees for which the Surety issued performance and payment bonds on behalf of Urban Farmers (hereafter referred to as "Bonded Contracts" and "Common Obligee Non-Bonded Contracts").

### BACKGROUND AND RECITALS

A.     On July 19, 2013, Urban Farmer filed a voluntary petition for reorganization under Chapter 11 of Title 11 U.S.C. in the District of Colorado (the "Petition"). The bankruptcy proceeding resulting from the filings was assigned Case No. _____ (the "Bankruptcy Proceeding");

B.     As of the commencement of the Bankruptcy Proceeding, Urban Farmer owed Citywide Bank ("Bank") the Bank principal and interest approximately $2,333,278.79 (referred to hereafter as the "Bank Debt") pursuant to the documents identified on schedule 1 of this Agreement. Schedule 1 includes the documents granting the Bank an alleged security interest in certain of Urban Farmer's property;

C.     The Surety issued performance and payment bonds securing the obligation of Urban Farmer to perform work and pay for labor and materials on a number of projects as described on schedule 2 of this Agreement ("Bonded Contracts") and further on certain non-bonded projects the party with whom Urban Farmer contracted is the same as the obligee as certain bonded projects ("Common Obligee Non-Bonded Contracts");

D.     Urban Farmer, among others executed certain Agreements of Indemnity in favor of the Surety (copies of which are attached hereto as Exhibit A and incorporated herein by reference) by which, among other things, Urban Farmer agreed to make all payments required under the bonds and to indemnify the Surety from losses, including fees and expenses, incurred by reason of the execution of the bonds;

E.     Urban Farmer has sought and is unable to obtain financing to pay these obligations from any other source, either unsecured or secured;

E.     The Surety want to assure that the receivables recovered on Bonded Contracts and the net profits, if any, on Common Obligee Non-Bonded Contracts are first applied to current receivables and payroll on bonded projects, and to assure that collateral is held to secure the Surety from contested claims or reimburse the Surety for losses pursuant to its equitable rights of subrogation to the Obligees' and Payment Bond Claimants' rights;

1

Exhibit 2

F.      Urban Farmer seeks to generate funds to help sustain its operations from the receivables received by satisfying the past due accounts payables on bonded and non-bonded projects;

G.      Urban Farmer both acknowledges that its obligations under the Agreements of Indemnity remain in full force and effect and that the bonds issued on its behalf by Surety are financial accommodations that Urban Farmer cannot assume and that Urban Farmer needs under the terms of its contracts with others, and which Urban Farmer cannot obtain in the ordinary course of business from another surety; and

H.      Urban Farmer desires to use the cash collateral of the Surety in order to continue performance of certain of the bonded contracts.

## AGREEMENT

NOW THEREFORE, in consideration of the mutual promises and agreements of the parties hereto, as adequate protection to the Surety within the, meaning of § 361 and § 363(e) of the Bankruptcy Code, and in accordance with § 364 of the Bankruptcy Code, Urban Farmer and the Surety agree as follows:

1.      **Incorporation of Recitals.** The recitals set forth above are incorporated into this Agreement.

2.      **Lifting of the Automatic Stay.** Urban Farmer agrees the Surety is entitled to the automatic and absolute lifting of the automatic stay under § 362 of the Bankruptcy Code to enable the Surety to collect, use, and apply the Bonded Contract Receivables in accordance with the terms of this Agreement and if necessary to enable the Surety to foreclose upon and sell the additional collateral being pledged to the Surety by a Replacement Lien as described in section 12 below. The automatic stay is vacated to enable the Surety to take actions in accordance with this Agreement to protect its interests.

3.      **Debtor's Acknowledgment of Bank's Interest in Cash Collateral.** Urban Farmer acknowledges that the Bank claims a valid, perfected and enforceable liens in certain of Urban Farmer's right, title and interest as Debtor in and to the collateral referred to in the Bank's Security Documents to the extent the collateral existed at the time the Petition was filed (collectively "Pre-Petition Collateral") and that the Bank asserts that all of the Pre-Petition Collateral secures all of Urban Farmer's obligations and liability under the Bank's loan documents. Urban Farmer further acknowledges that the value of the Pre-Petition Collateral was, as of the date of the filing of the Petition in excess of the Bank Debt, but that Urban Farmer's use of the cash collateral as Debtor will result in a diminution of the Pre-petition Collateral, and the Bank's interest therein. Urban Farmer agrees the bank's collateral, whatever that may ultimately be, will not be used to pay Urban Farmer's professional fees and that the use of the cash collateral is consistent with the requirements of In Re Morningstar Ranch and the Colorado Mechanics Lien Trust Fund Statute. Urban Farmer asserts that the

2

Bank is over secured by other real estate collateral and that therefore Urban Farmer may use the Bank's cash collateral.

4. **Acknowledgment by Urban Farmer of the Surety's Equitable Interest in Bonded Receivables and the Surety' Rights to Adequate Protection.** By reason of the execution of the bonds, the execution of the Agreements of Indemnity, the receipt of claims the Surety must discharge on its bonds, and the default of Urban Farmer of its obligations under the bonds and the Agreements of Indemnity, Urban Farmer acknowledges that the Surety has legal and equitable rights including the right to insure full compliance with the Colorado Trust Fund Statute in and to:

> (a) all monies due or to become due Urban Farmer on bonded contracts (whether falling due pre-petition or post-petition), including, but not limited to, contract balances, progress payments, deferred payments, retained percentages, compensation for extra work and proceeds of damages claims, and monies of any other kind and nature due on the contracts (hereafter referred to as "Bonded Receivables");

> (b) all of Urban Farmer's right, title and interest in and to all sub-subcontracts, let or to be let, in connection with bonded contracts and in and to all surety bonds covering Urban Farmer's interest in these subcontracts;

> (c) all of Urban Farmer's right, title and interest in and to all actions, causes of action, claims and demands of whatsoever kind or nature arising from the bonded contracts, including, but not limited to, all claims against any owner, subcontractor, laborer or materialman and against any surety or Surety of such subcontractors, laborers or materialman; and

> (d) all monies to become due to Urban Indemnity on Common-Obligee Non-Bonded contracts but only to the extent necessary to cover losses not recovered by the Surety on bonded contracts with Common Obligees.

By virtue of the Surety' equitable interest in the Bonded Contract Receivables and the receivables on Non-Bonded Common Obligee Contracts, the Surety has an interest in Cash Collateral within the meaning of § 363(a) of the Bankruptcy Code.

Urban Farmer acknowledges that the Surety' interest in and to bonded contract funds can receive adequate protection, as that term is used in the Bankruptcy Code, by Urban Farmer's performance of the bonded contracts and by disbursement of the contract funds to satisfy performance and payment obligations on the assumed contracts that would otherwise be obligations under Surety's bonds, or by disbursement of the contract funds in accordance with the priorities established below in this Agreement. Urban Farmer acknowledges that to the extent the Surety incurs a loss or losses on bonded projects, and to the extent that Bonded Receivables are required for the prosecution of bonded contract work and to pay for materials and labor required for that work, the Surety possesses a right and interest in Bonded

Receivables that is superior and prior to any right of Urban Farmer to possess or use the Bonded Receivables by virtue of any perfected interest in the Bonded Receivables or Replacement Lien granted under the terms of this Agreement.

     5.    **Application of Receivables Recovered.** The receivables recovered by reason of the advance of funds by the Surety as set forth above in section 4 will be deposited into the Urban Farmer Bonded Receivables Account, described below in paragraph 6, and held and disbursed in accordance with terms governing that account and the priorities for disbursement.

     6.    **Use or Cash Collateral, Trust Nature of Bonded Receivables and Deposit of Contract Funds into Urban Farmer Bonded Receivables Account and Surety Reserve Account.** Subject to the other terms of this Agreement, Urban Farmer is permitted to use Cash Collateral from and after the date of approval of this Agreement by the Court through (the "Interim Period"), subject to each of the following conditions:

          a.    Two controlled bank accounts shall be established by Urban Farmer, as follows:

              i.    Urban Farmer Bonded Receivables Account;

              ii.    Urban Farmer Cash Collateral Account.

          b.    Urban Farmer agrees that all Bonded Receivables due and not yet paid to Urban Farmer and due Urban Farmer in the future on any project for which the Surety provided performance and payment bonds will be deposited into the "Urban Farmer Bonded Receivables Account". The funds deposited into the account shall consist of all Bonded Receivables on contracts performed by Urban Farmer. Prior to the rejection of contracts, Bonded Receivables from bonded contracts will be deposited into this account until the contract is rejected. Funds deposited in this account will be held in trust and disbursed in accordance with the priority set forth below. The Surety shall have the authority to control and approve disbursements from the Urban Farmer Bonded Receivables Account. Urban Farmer and the Surety will notify each obligee of this arrangement and obtain their consent for direct payment of these funds into this account. A letter of direction to each Obligee signed by Urban Farmer and the Surety will be sent to each obligee. In the event the obligees will not consent to the direct deposit of funds into the account, Urban Farmer will provide any endorsement, signature(s) or document(s) required to ensure deposit of the funds to the Special Account(s). Urban Farmer acknowledges that all contract funds (extras, claims, progress payments, retained funds) paid to it from contracts bonded by the Surety are trust funds to be deposited into the Urban Farmer Bonded Receivables Account and disbursed in accordance with the following priorities:

First, funds received through each payment from a project or contract will be disbursed to satisfy accounts payable and other direct job costs[1] that might otherwise be obligations of the Surety under the performance of payment bonds for that project or contract;

Second, funds received will be applied to cover the ratable portion of Urban Farmer's operating and administrative expenses, including payroll, incurred on projects bonded by the Surety that are not direct project costs covered in the first priority;

Third, amounts in excess of the first and second priorities will be transferred to the Urban Farmer Cash Collateral Account.

No other party has a right to setoff or disburse funds held in the Urban Farmer Bonded Receivables Account in any other manner than the priorities set forth above. Surety has the absolute right to disburse funds to satisfy the payments due in accordance with the foregoing priorities and to setoff funds from the account in the event that Urban Farmer defaults on one or more of the contracts it seeks to assume or has assumed. In the event of a default or rejection of a bonded contract the Surety can take control of the contracts and contract funds (Bonded Receivables) without depositing them into the Urban Farmer Bonded Receivables Account. Urban Farmer must turn over to Surety all funds held in the Bonded Receivables Account that were deposited from any contract Urban Farmer rejects or any contract for which Urban Farmer is declared to be in default, which default is not timely cured.

c.      All Cash Collateral owned by Urban Farmer on the Petition Date and all Cash Collateral received by Urban Farmer post-petition other than the Cash Collateral deposited in the Urban Farmer Bonded Receivables Account shall be deposited in the Urban Farmer Cash Collateral Account. Urban Farmer as Debtor shall be permitted to use Cash Collateral from the Urban Farmer Cash Collateral Account during the Interim Period.

7.      **Procedure for Verification of Accounts Payable for Disbursements from the Urban Farmer Bonded Receivables Account.** The Surety shall approve disbursements from the Urban Farmer Bonded Receivables Account. Urban Farmer shall submit to the Surety with each pay requisition to be submitted to the obligee, at the time such requisition is submitted, a copy of each requisition together with a line item list of the parties that must be paid with funds from each requisition and the amounts of the payments. Urban Farmer will provide accounting and other financial data to enable the Surety to verify the payments are properly made from the Urban Farmer Bonded Receivables Account in accordance with the

---

[1]      "Direct job costs" refers to payments to sub-subcontractors and suppliers and generally to the costs of labor and materials required for the prosecution of the work at the site of the project(s)and does not include Urban Farmer payroll or other operating costs.

priorities for disbursement. This information must be submitted immediately to enable the Surety to conduct an investigation of the requisitions and to give the Surety's approval of payments.

8.     **Rejected Executory Contracts.** Urban Farmer shall immediately consult with the bonding company and the obligees to determine whether or not move to reject the following contracts on schedule 2:  Burlingame Ranch Phase II (Job ID 3100456T with Haselden as Obligee), SDS Water Treatment Plant (Job ID 3100485T with McCarthy as Obligee), and I 70 Widening at Grand Junction (Job ID 3100490TC with Lawson as Obligee). Urban Farmer agrees to reject the three contracts above, if so directed by the Surety after full consultation. Urban Farmer shall move to reject the remaining bonded contracts it intends to reject within 20 days of the date of the filing of the petition initiating this cause.  In the event that the court orders additional contracts be rejected, the Surety is entitled to take control of all Bonded Receivables from such rejected contract or contracts.  Urban Farmer acknowledges that in that event the Surety's interest in the Bonded Receivables from the rejected contract or contracts is not adequately protected and agrees:

> (a)     any right of Urban Farmer to use cash collateral from the Bonded Receivables from such rejected contract or contracts is extinguished and terminated; and Urban Farmer waives any right or claim to apply for use of such cash collateral pursuant to § 363 of the Bankruptcy Code;

> (b)     the Surety shall be entitled to use and apply the Bonded Receivables from such rejected contract or contracts at its sole option and discretion;

> (c) Urban Farmer shall surrender and abandon the premises of the project(s) related to the rejected contract or contracts;

> (d) Bonded Receivables from such rejected contract or contracts will no longer be deposited into the Urban Farmer Bonded Receivables Account;

> (e) the Surety shall have the right, but not the duty, to complete or arrange for completion of the rejected contract or contracts.

9.     **Breach of Agreement, Events of Default, Conversion, Dismissal and Cessation of Business.** In the event of a failure of Urban Farmer to comply with the terms and provisions of this Agreement, or upon dismissal or conversion of the Chapter 11 case, the appointment of a Chapter 11 trustee, the cessation of Urban Farmer's business, or change in management of Urban Farmer, the use of cash collateral provided in this Agreement shall terminate immediately.  In such event, the Surety shall be entitled to the use of the Bonded Receivables from all of the bonded contracts as provided in paragraph 9 as though all such contracts were rejected and shall be entitled to foreclose upon its replacement lien on the vehicles described in section 12.  The Surety shall also be entitled to exercise any and all rights under this Agreement, the Agreements of Indemnity or that they possess by law.  In addition to the foregoing, events of default include the following:

6

a.    Urban Farmer's failure to comply with the terms of this Agreement within three business days of the date that compliance is due including, but not limited to, repayment of the line of credit loan with interest when and as payments are due;

b.    Urban Farmer shall in the Surety's sole judgment fail to make adequate progress towards completion or be declared in default, post-petition, and does not reasonably cure the default, on one or more bonded contracts that are not rejected as provided in section 8 above; in such event, the Surety can, in its discretion, terminate this Agreement, and Urban Farmer will have no further right to use Bonded Receivables as Cash Collateral, and upon electing to terminate the Agreement, the Surety shall have no obligation to provide further funding and shall have the right to use all Bonded Receivables as provided in Section 8 above.

10.    **Reporting Requirements.** During the Interim Period, Urban Farmer shall provide to the Surety (a) on Monday of each week a report showing the amount of Cash Collateral used since the preceding Monday; (b) on each Monday a report showing the amounts of cash received and accounts generated since the preceding Monday, the amounts proposed and projected to be used in the week staring; (c) a variance report identifying and stating reasons for any material variances between projected and actual cash received and accounts generated for the preceding week; (d) on each Monday, a cash flow projection for the week then starting and each of the next six weeks, and (e) a statement showing actual cash flow for the immediately preceding week and a variance report identifying and stating the reasons for any material variances between the projected and actual cash flow for such preceding week. Urban Farmer will work out a procedure with the Surety for approval of the disbursements to be made from the Urban Farmer Bonded Receivables Accounts to the First and Second priorities for payments from that account. Urban Farmer acknowledges these disbursements are to be made with the approval of the Surety.

All reports shall identify and report revenue and expenses related to bonded contracts separately from other revenue and expenses. No later than two days prior to the date scheduled for the Final Hearing, Urban Farmer shall furnish to the Surety a final report showing the accurate amounts for cash collections and accounts generated for the period between the date the Petition was filed and the third business day prior to the date scheduled for the Final Hearing.

11.    **Access to Projects, Collateral and Financial Information.** Urban Farmer shall give the Surety and its agents and retained professionals, reasonable access to all bonded projects upon request and allow them to examine and copy the Debtor's books and records, including, without limitation, accounts receivable ageings, accounts payable ageings, general ledger, the maintenance records of any equipment or machinery that constitute Collateral. Urban Farmer shall also afford the Surety (including appraisers or other consultants retained by the Surety) reasonable access to any equipment or machinery which constitute Collateral

7

and to the files and records on ongoing projects being performed by the Debtor or its sub-subcontractors.

12. **Additional Financing and Replacement Lien.** To provide adequate protection to the Surety for the use of Cash Collateral and the line of credit set forth in section 13 after commencement of the Bankruptcy Proceeding, the Debtor hereby grants to the Surety a first priority security interest (the "Replacement Lien") in all of the following property described in schedule 3 hereto and will cooperate with the Surety to perfect first liens in that property according to Colorado law.

13. **Line of Credit.** The Surety agrees that as long as The Urban Farmer makes adequate progress towards completion of non-terminated Bonded Contracts that the Surety will make available additional funding – totaling $250,000, to Urban Farmer's Cash Collateral Account pursuant to the attached schedule 4. The funding payment terms shall be as set forth in schedule 4 with draws against line of credit accruing interest at the rate of 8% per annum (12% if there is any default in payment the entire amount advanced shall become immediately due and payable with no further draws permitted). The Replacement Lien shall secure the Line of Credit funding **and also** Urban Farmer's obligations under the Agreements of Indemnity.

14. **Court Approval.** This Agreement shall become effective upon being approved by the Court pursuant to an order in a form satisfactory to the Surety in the Bankruptcy Proceeding.

15. **Further Acts.** Urban Farmer shall take all further actions reasonably requested by the Surety to effect the intent of this Agreement, including without limitation, executing security agreements and financing statements and executing documents required for the disbursement and receipt of Bonded Receivables and required for the close out of bonded contracts. Nothing contained herein shall limit the right of the Surety to seek further adequate protection under §§ 361 and 363 of the Bankruptcy Code, seek relief from the Automatic Stay under § 362 of the Bankruptcy Code, or seek any other relief whatsoever at any future time. Whether or not the Surety seeks further adequate protection, in the event that the Surety suffers a loss on a bonded contract, it shall have a priority to the Bonded Receivables under Bankruptcy Code § 507(a)(1) that is prior to the interest of any other party asserting such a priority. Without limiting the generality of the foregoing, Urban Farmer acknowledges that the Surety may move the Court for additional adequate protections or a revision of this Agreement in the event that Urban Farmer's financial projections varies materially or in the event that Urban Farmer is using Cash Collateral at a materially faster rate than the rate at which it is generating post-petition accounts receivable, or that the Bonded Receivables appear insufficient for the prosecution of the bonded contracts and thus the Surety is not adequately protected.

16. **Agreement is for Post-Petition Financing; No Reversal or Modification of Rights on Appeal.** Urban Farmer acknowledges that all extensions of credit or other financial accommodations made by Surety are made in good faith within the meaning of Bankruptcy

Code section 364(e) and, therefore, that neither the reversal nor the modification on appeal of any order authorizing Urban Farmer to enter into or perform any obligations under this Agreement shall limit, impair or have any effect upon the validity of any priority or any lien in favor of Surety granted or acknowledged under the terms of this Agreement.

17. **Reservation of Rights; Agreement Binding on any Subsequently Appointed Trustee.** Nothing contained in this Agreement shall in any way prejudice or waive the legal and equitable rights of the Surety. This Agreement shall be binding upon the parties hereto and respective successors and assigns, and in the case of Urban Farmer as the Debtor, upon the creditors and other parties in interest in the Bankruptcy Proceeding and any trustee, receiver, examiner appointed therein.

**IN WITNESS WHEREOF,** the parties have executed this Agreement this 19th day of July, 2013.


**Rest of Page Intentionally Left Blank**

The Urban Farmer, Inc.

_Karen Tollefson_
ITS: _President_

United Fire & Casualty Company

ITS: _____

10

The Urban Farmer, Inc.

ITS: _____

United Fire & Casualty Company

ITS: _Senior Surety Claims Rep._

**Exhibit A**

🔘
**United Fire & Casualty Company**
CEDAR RAPIDS, IOWA

40 3

06/27/2013 08:04 AM

### AGREEMENT OF INDEMNITY

We, the undersigned, hereinafter referred to as Indemnitors, hereby request UNITED FIRE & CASUALTY COMPANY, hereinafter referred to as Surety, to furnish instruments of suretyship, hereinafter referred to as Bonds, and as an inducement therefore we make the following representations of fact, promises and agreements

WITNESSETH WHEREAS, the Contractor, in the performance of contracts and the fulfillment of obligations generally, whether in its own name solely or as co-adventurer with others, may desire, or be required to give or procure certain bonds, or continue or substitute the same from time to time, or new bonds, with the same or different penalties, and/or conditions, may be desired or required, in renewal, continuation, extension or substitution thereof, or the contractor or indemnitors may request the Surety to refrain from canceling said bonds, and

WHEREAS, at the request of the Contractor and the Indemnitors and upon the express understanding that this Agreement of Indemnity should be given, the Surety has executed and may from time to time hereafter execute said Bonds on behalf of the Contractor, and

WHEREAS, the Indemnitors have a substantial, material and beneficial interest in the obtaining of the Bonds or in the Surety's refraining from canceling said Bonds

NOW, THEREFORE, in consideration of the premises the Contractor and Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows

**PREMIUMS FIRST** The Contractor and Indemnitors will pay to the Surety all premiums and charges of the Surety for the Bonds until the Contractor or Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from the Bonds and all liability by reason thereof

**INDEMNITY SECOND** The Contractor and Indemnitors shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur (1) By reason of having executed the Bonds, (2) By reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefore Such payment shall be equal to the amount of the reserve set by the Surety In the event of any payment by the Surety the Contractor and Indemnitors further agree that in any accounting between the Surety and the Contractor, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed, and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety

**ASSIGNMENT THIRD** The Contractor, the Indemnitors hereby consenting, will assign, transfer and set over, and does hereby assign, transfer and set over to the Surety, as collateral, to secure the obligations in any and all of the paragraphs of this Agreement and any other indebtedness and liabilities of the Contractor to the Surety, whether heretofore or hereafter incurred, the assignment in the case of each contract to become effective as of the date of the bond covering such contract, but only in the event of (1) any abandonment, forfeiture or breach of any contracts referred to in the Bonds or of any breach of any said Bonds, or (2) of any breach of the provisions of any of the paragraphs of this Agreement, or (3) of a default in discharging such other indebtedness or liabilities when due, or (4) of any assignment by the Contractor for the benefit of creditors, or of the appointment, or of any application for the appointment, of a receiver or trustee for the Contractor whether insolvent or not, or (5) of any proceeding which deprives the Contractor of the use of any of the machinery, equipment, plant, tools or material referred to in section (b) of this paragraph, or (6) of the Contractor's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Contractor be an individual (a) All the rights of the Contractor in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner our of the Bonds, (b) All the rights, title and interest of the Contractor in and to all machinery, equipment, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of said sites, (c) All the rights, title and interest of the Contractor in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts, (d) All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialmen, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any and all contracts referred to in the Bonds, and against any surety or sureties of any subcontractor, laborer, or materialman, (e) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest

**TRUST FUND FOURTH** If any of the Bonds are executed in connection with a contract which by its terms or by law prohibits the assignment of the contract price, or any part thereof, the Contractor and Indemnitors covenant and agree that all payments received for or on account of said contract shall be held as a trust fund in which the Surety has an interest, for the payment of obligations incurred in the performance of the contract and for labor, materials, and services furnished in the prosecution of the work provided in said contract or any authorized extension of modification thereof, and, further, it is expressly understood and declared that all monies due and to become due under any contract or contracts covered by the Bonds are trust funds, whether in the possession of the Contractor or Indemnitors or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract or contracts for which the Surety would be liable under any of said Bonds, which said trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any said Bonds, and this Agreement and declaration shall also constitute notice of such trust

**UNIFORM COMMERCIAL CODE FIFTH** That this Agreement shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity

**TAKEOVER SIXTH** In the event of any breach, delay or default asserted by the obligee in any said Bonds, or the Contractor has suspended or ceased work on any contract or contracts covered by any said Bonds, or failed to pay obligations incurred in connection therewith, or in the event of the death, disappearance, conviction for a felony, imprisonment, incompetency, insolvency, or bankruptcy of the Contractor, or the appointment of a receiver or trustee for the Contractor, or if any action is taken by or against the Contractor under or by virtue of the Bankruptcy Code, or should reorganization or arrangement proceedings be filed by or against the Contractor under said Code or if any action is taken by or against the Contractor under the insolvency laws of any state, possession, or territory of the United States the Surety shall have the right, at its option and in its sole discretion and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession of any part or all of the work under any contract or contracts covered by any said Bonds, and at the expense of the Contractor and Indemnitors to complete or arrange for the completion of the same, and the Contractor and Indemnitors shall promptly, upon demand pay to the Surety all losses, and expenses so incurred

CHANGES SEVENTH The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors to assent to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or specifications accompanying said contracts, including, but not limited to, any change in the time for the completion of said contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefore, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of said Indemnitors

ADVANCES EIGHTH The Surety is authorized and empowered to guarantee loans, to advance or lend to the Contractor any money, which the Surety may see fit, for the purpose of any contracts referred to in, or guaranteed by the Bonds, and all money expended in the completion of any such contracts by the Surety, or lent or advanced from time to time to the Contractor, or guaranteed by the Surety for the purposes of any such contracts, and all costs, and expenses incurred by the Surety in relation thereto, unless repaid with legal interest by the Contractor to the Surety when due, shall be presumed to be a loss by the Surety for which the Contractor and the Indemnitors shall be responsible, notwithstanding that said money or any part thereof should not be so used by the Contractor

BOOKS AND RECORDS NINTH At any time, and until such time as the liability of the Surety under any and all said Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Contractor and Indemnitors, and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including, but not limited to, the status of the work under contracts being performed by the Contractor, the condition of the performance of such contracts and payments of accounts

DECLINE EXECUTION TENTH Unless otherwise specifically agreed in writing, the Surety may decline to execute any Bond and the Contractor and Indemnitors agree to make no claim to the contrary in consideration of the Surety's receiving this Agreement, and if the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any and all of the bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond

NOTICE OF EXECUTION ELEVENTH The Indemnitors hereby waive notice of the execution of said Bonds and of the acceptance of this Agreement, and the Contractor and the Indemnitors hereby waive all notice of any default, or any other act or acts giving rise to any claim under said Bonds, as well as notice of any and all liability of the Surety under said Bonds, and any and all liability on their part hereunder, to the end and effect that, the Contractor and the Indemnitors shall be and continue liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might have been entitled to make

HOMESTEAD TWELFTH The Contractor and the Indemnitors hereby waive, so far as their respective obligations under this Agreement are concerned, all rights to claims any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any State, Territory, or Possession

SETTLEMENTS THIRTEENTH The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgement upon the Bonds, unless the Contractor and the Indemnitors shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgement, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount, to be used in paying any judgement or judgements rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety

SURETIES FOURTEENTH In the event the Surety procures the execution of the Bonds by other sureties, or executes the Bonds with co-sureties, or reinsures any portion of said Bonds with reinsuring sureties, than all the terms and conditions of this Agreement shall inure to the benefit of such other sureties, co-sureties and reinsuring sureties, as their interests may appear

SUIT FIFTEENTH Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgement upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising

OTHER INDEMNITY SIXTEENTH That the Contractor and the Indemnitors shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of the Contractor and the Indemnitors, accepted or released other agreements of indemnity or collateral in connection with the execution or procurement of said Bonds, from the Contractor or Indemnitors or others, it being expressly understood and agreed by the Contractor and the Indemnitors that any and all other rights which the Surety may have or acquire against the Contractor and the Indemnitors and/or others under any such other or additional agreements of indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement

INVALIDITY SEVENTEENTH In case any of the parties mentioned in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed. It is understood and agreed by the Contractor and Indemnitors that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Contractor and Indemnitors or others whether by the terms of any other agreement or by operation of law or otherwise

INDEMNITY WAIVER EIGHTEENTH The Indemnitors waive any defense that this instrument was executed subsequent to the date of any such bond, admitting and covenanting that such bond was executed pursuant to the Indemnitors' request and in reliance on the Indemnitors' promise to execute this instrument

ATTORNEY IN FACT NINETEENTH The Contractor and Indemnitors hereby irrevocably nominate, constitute appoint and designate the Surety as their attorney-in-fact with the right, but not the obligation, to exercise all of the rights of the Contractor and Indemnitors assigned, transferred and set over to the Surety in the Agreement, and in the name of the Contractor and Indemnitors to make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also to give full protection intended to be herein given to the Surety under all other provisions of this Agreement The Contractor and Indemnitors hereby ratify and confirm all acts and actions taken and done by the Surety as such attorney-in-fact

TERMINATION TWENTIETH This Agreement may be terminated by the Contractor or Indemnitors upon twenty days written notice sent by registered mail to the Surety at its home office at Cedar Rapids, Iowa but any such notice of termination shall not operate to modify, bar, or discharge the Contractor or the Indemnitors as to the Bonds that may have been theretofore executed

TWENTY-FIRST This Agreement may not be changed or modified orally No change or modification shall be effective unless made by written endorsement executed to form a part hereof

For Acknowledgement of Contractor's Signature

STATE OF _Colorado_   )
                       ) ss
COUNTY OF _Adams_      )
On this _____11_____ day of _June_ _____, in the year _2013_____, before me personally
come(s) Karen L. Tollefson

INDIVIDUAL ACKNOWLEDGEMENT  to me known and known to me to be the person(s) who (is) (are) described in and who executed the foregoing
instrument and acknowledge(s) to me that he executed the same

PARTNERSHIP ACKNOWLEDGEMENT  A member of the co-partnership of _____
to me known and known to me to be the person who is described in and who executed the foregoing instrument, and acknowledges to me that he executed
the same as and for the act and deed of the said co-partnership

CORPORATE ACKNOWLEDGEMENT  to me know, who, by me duly sworn, deposes and says that she reside in the City of _Thornton_
that she  is the _President_ _____ of Urban Farmer, Inc
the corporation described in and which executed the foregoing instrument, that she know  the seal of the said corporation, that the seal affixed to the said
instrument is such corporate seal, that it was so affixed by the order of the Board of Directors of said corporation, and that she signed  her name thereto by
like order

SANDRA L ZARLENGO-LEE
MY COMMISSION **NOTARY PUBLIC**
**STATE OF COLORADO**
NOTARY ID 19974012213
MY COMMISSION EXPIRES OCT 18, 2014

_Sandra L Zarlengo-Lee_
NOTARY PUBLIC (SIGNATURE AND TITLE OF OFFICIAL TAKING ACKNOWLEDGMENT)

For Acknowledgment of Indemnitor's Signatures

INDIVIDUAL ACKNOWLEDGEMENT

STATE OF _Colorado_    )
                        ) ss
COUNTY OF _Adams_       )
On this _____11_____ day of _June_ _____, in the year _2013_____, before me personally
come(s) Karen Tollefson, individually

to me known and known to me and to me to be the person(s) who (is) (are) described in and who executed the foregoing instrument and acknowledge(s) to me that
she executed

SANDRA L ZARLENGO-LEE
MY COMMISSION **NOTARY PUBLIC**
**STATE OF COLORADO**
NOTARY ID 19974012213
MY COMMISSION EXPIRES OCT 18, 2014

_Sandra L Zarlengo-Lee_
NOTARY PUBLIC (SIGNATURE AND TITLE OF OFFICIAL TAKING ACKNOWLEDGMENT)

INDIVIDUAL ACKNOWLEDGEMENT

STATE OF _Colorado_    )
                        ) ss
COUNTY OF _Adams_       )
On this _____11_____ day of _June_ _____, in the year _2013_____, before me personally
come(s)

to me known and known to me to be the person(s) who (is) (are) described in and who executed the foregoing instrument and acknowledge(s) to me that
they executed

SANDRA L ZARLENGO-LEE
MY COMMISSION **NOTARY PUBLIC**
**STATE OF COLORADO**
NOTARY ID 19974012213
MY COMMISSION EXPIRES OCT 18, 2014

_Sandra L Zarlengo-Lee_
NOTARY PUBLIC (SIGNATURE AND TITLE OF OFFICIAL TAKING ACKNOWLEDGMENT)

LIMITED LIABILITY CORPORATION ACKNOWLEDGEMENT

STATE OF _Colorado_    )
                        ) ss
COUNTY OF _Adams_       )
On this _____11_____ day of _June_ _____, in the year _2013_____, before me personally
come(s) Karen L. Tollefson

to me known, who, being by me duly sworn, deposes and says that she reside in the City of _Thornton_
that she is the _Owner_ of DKR Land Development Enterprises, LLC, the limited liability corporation described in and which executed the foregoing instrument,
that they know the seal of the said limited liability corporation, that the seal affixed to the said instrument is such corporate seal, that is was so affixed by the
order of the Board of Directors of said limited liability corporation, and that she signed her name thereto by like order

SANDRA L ZARLENGO-LEE
MY COMMISSION **NOTARY PUBLIC**
**STATE OF COLORADO**
NOTARY ID 19974012213
MY COMMISSION EXPIRES OCT 18, 2014

_Sandra L Zarlengo-Lee_
NOTARY PUBLIC (SIGNATURE AND TITLE OF OFFICIAL TAKING ACKNOWLEDGMENT)

LIMITED LIABILITY CORPORATION ACKNOWLEDGEMENT

STATE OF _Colorado_    )
                        ) ss
COUNTY OF _Adams_       )
On this _____11_____ day of _June_ _____, in the year _2013_____, before me personally
come(s) Karen L. Tollefson

to me known, who, being by me duly sworn, deposes and says that she reside in the City of _Thornton_
that she is the _Owner_ of DKR Leasing, LLC, the limited liability corporation described in and which executed the foregoing instrument, that they know the seal
of the said limited liability corporation, that the seal affixed to the said instrument is such corporate seal, that is was so affixed by the order of the Board of
Directors of said limited liability corporation, and that she signed her name thereto by like order
MY COMMISSION EXPIRES

_Sandra L Zarlengo-Lee_
NOTARY PUBLIC (SIGNATURE AND TITLE OF OFFICIAL TAKING ACKNOWLEDGMENT)

IN WITNESS WHEREOF, we have hereunto set our hands and seals this 16th day of May, 2013

ATTEST OR WITNESS

Urban Farmer, Inc
(FULL NAME & ADDRESS OF CONTRACTOR)

Thornton, CO

By _Karen L. Tollefson_ (SEAL)
Karen L. Tollefson, President (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

By _Karen L. Tollefson_

Karen L. Tollefson, Individually (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

DKR Land Development Enterprises, LLC
(FULL NAME & ADDRESS OF INDEMNITOR)

Thornton, CO

by _Karen L. Tollefson_

Karen L. Tollefson, Owner
(FULL NAME & ADDRESS OF INDEMNITOR)

DKR Leasing, LLC (SEAL)

Thornton, CO

by _Karen L. Tollefson_

Karen L. Tollefson, Owner (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

(FULL NAME & ADDRESS OF INDEMNITOR)

(FULL NAME & ADDRESS OF INDEMNITOR)

BY (SEAL)

(SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

(FULL NAME & ADDRESS OF INDEMNITOR)

BY (SEAL)

(SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

UNITED FIRE & CASUALTY COMPANY
(SURETY)

CEDAR RAPIDS, IOWA

By _Patricia Wichel_ (SEAL)
ATTORNEY-IN-FACT

# United Fire & Casualty Company
CEDAR RAPIDS, IOWA

## AGREEMENT OF INDEMNITY

We, the undersigned, hereinafter referred to as Indemnitors, hereby request UNITED FIRE & CASUALTY COMPANY, hereinafter referred to as Surety, to furnish instruments of suretyship, hereinafter referred to as Bonds, and as an inducement therefore we make the following representations of fact, promises and agreements.

**WITNESSETH:** WHEREAS, the Contractor, in the performance of contracts and the fulfillment of obligations generally, whether in its own name solely or as co-adventurer with others, may desire, or be required to give or procure certain bonds, or continue or substitute the same from time to time; or new bonds, with the same or different penalties, and/or conditions, may be desired or required, in renewal, continuation, extension or substitution thereof; or the contractor or indemnitors may request the Surety to refrain from canceling said bonds; and .

WHEREAS, at the request of the Contractor and the Indemnitors and upon the express understanding that this Agreement of Indemnity should be given, the Surety has executed and may from time to time hereafter execute said Bonds on behalf of the Contractor; and

WHEREAS, the Indemnitors have a substantial, material and beneficial interest in the obtaining of the Bonds or in the Surety's refraining from canceling said Bonds.

NOW, THEREFORE, in consideration of the premises the Contractor and Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

**PREMIUMS FIRST:** The Contractor and Indemnitors will pay to the Surety all premiums and charges of the Surety for the Bonds until the Contractor or Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from the Bonds and all liability by reason thereof.

**INDEMNITY SECOND:** The Contractor and Indemnitors shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed the Bonds, (2) By reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement. Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefore. Such payment shall be equal to the amount of the reserve set by the Surety. In the event of any payment by the Surety the Contractor and Indemnitors further agree that in any accounting between the Surety and the Contractor, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety.

**ASSIGNMENT THIRD:** The Contractor, the Indemnitors hereby consenting, will assign, transfer and set over, and does hereby assign, transfer and set over to the Surety, as collateral, to secure the obligations in any and all of the paragraphs of this Agreement and any other indebtedness and liabilities of the Contractor to the Surety, whether heretofore or hereafter incurred, the assignment in the case of each contract to become effective as of the date of the bond covering such contract, but only in the event of (1) any abandonment, forfeiture or breach of any contracts referred to in the Bonds or of any breach of any said Bonds; or (2) of any breach of the provisions of any of the paragraphs of this Agreement; or (3) of a default in discharging such other indebtedness or liabilities when due; or (4) of any assignment by the Contractor for the benefit of creditors, or of the appointment, or of any application for the appointment, of a receiver or trustee for the Contractor whether insolvent or not; or (5) of any proceeding which deprives the Contractor of the use of any of the machinery, equipment, plant, tools or material referred to in section (b) of this paragraph; or (6) of the Contractor's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Contractor be an individual: (a) All the rights of the Contractor in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner our of the Bonds; (b) All the rights, title and interest of the Contractor in and to all machinery, equipment, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of said sites; (c) All the rights, title and interest of the Contractor in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts; (d) All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any and all contracts referred to in the Bonds; and against any surety or sureties of any subcontractor, laborer, or materialman; (e) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.

**TRUST FUND FOURTH:** If any of the Bonds are executed in connection with a contract which by its terms or by law prohibits the assignment of the contract price, or any part thereof, the Contractor and Indemnitors covenant and agree that all payments received for or on account of said contract shall be held as a trust fund in which the Surety has an interest, for the payment of obligations incurred in the performance of the contract and for labor, materials, and services furnished in the prosecution of the work provided in said contract or any authorized extension or modification thereof; and, further, it is expressly understood and declared that all monies due and to become due under any contract or contracts covered by the Bonds are trust funds, whether in the possession of the Contractor or Indemnitors or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract or contracts for which the Surety would be liable under any of said Bonds, which said trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any said Bonds, and this Agreement and declaration shall also constitute notice of such trust.

**UNIFORM COMMERCIAL CODE FIFTH:** That this Agreement shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity.

**TAKEOVER SIXTH:** In the event of any breach, delay or default asserted by the obligee in any said Bonds, or the Contractor has suspended or ceased work on any contract or contracts covered by any said Bonds, or failed to pay obligations incurred in connection therewith, or in the event of the death, disappearance, conviction for a felony, imprisonment, incompetency, insolvency, or bankruptcy of the Contractor, or the appointment of a receiver or trustee for the Contractor, or if any action is taken by or against the Contractor under or by virtue of the Bankruptcy Code, or should reorganization or arrangement proceedings be filed by or against the Contractor under said Code, or if any action is taken by or against the Contractor under the Insolvency laws of any state, possession, or territory of the United States the Surety shall have the right, at its option and in its sole discretion and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession of any part or all of the work under any contract or contracts covered by any said Bonds, and at the expense of the Contractor and Indemnitors to complete or arrange for the completion of the same, and the Contractor and Indemnitors shall promptly, upon demand pay to the Surety all losses, and expenses so incurred.

**CHANGES SEVENTH:** The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors to assent to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or specifications accompanying said contracts, including, but not limited to, any change in the time for the completion of said contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefore, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of said Indemnitors.

**ADVANCES EIGHTH:** The Surety is authorized and empowered to guarantee loans, to advance or lend to the Contractor any money, which the Surety may see fit, for the purpose of any contracts referred to in, or guaranteed by the Bonds; and all money expended in the completion of any such contracts by the Surety, or lent or advanced from time to time to the Contractor, or guaranteed by the Surety for the purposes of any such contracts, and all costs, and expenses incurred by the Surety in relation thereto, unless repaid with legal interest by the Contractor to the Surety when due, shall be presumed to be a loss by the Surety for which the Contractor and the Indemnitors shall be responsible, notwithstanding that said money or any part thereof should not be so used by the Contractor.

**BOOKS AND RECORDS NINTH:** At any time, and until such time as the liability of the Surety under any and all said Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Contractor and Indemnitors; and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including, but not limited to, the status of the work under contracts being performed by the Contractor, the condition of the performance of such contracts and payments of accounts.

**DECLINE EXECUTION. TENTH:** Unless otherwise specifically agreed in writing, the Surety may decline to execute any Bond and the Contractor and Indemnitors agree to make no claim to the contrary in consideration of the Surety's receiving this Agreement; and if the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any and all of the bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond.

**NOTICE OF EXECUTION ELEVENTH:** The Indemnitors hereby waive notice of the execution of said Bonds and of the acceptance of this Agreement, and the Contractor and the Indemnitors hereby waive all notice of any default, or any other act or acts giving rise to any claim under said Bonds, as well as notice of any and all liability of the Surety under said Bonds, and any and all liability on their part hereunder, to the end and effect that, the Contractor and the Indemnitors shall be and continue liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might have been entitled to make.

**HOMESTEAD TWELFTH:** The Contractor and the Indemnitors hereby waive, so far as their respective obligations under this Agreement are concerned, all rights to claims any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any State, Territory, or Possession.

**SETTLEMENTS THIRTEENTH:** The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgement upon the Bonds, unless the Contractor and the Indemnitors shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgement, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount, to be used in paying any judgement or judgements rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety.

**SURETIES FOURTEENTH:** In the event the Surety procures the execution of the Bonds by other sureties, or executes the Bonds with co-sureties, or reinsures any portion of said Bonds with reinsuring sureties, then all the terms and conditions of this Agreement shall inure to the benefit of such other sureties, co-sureties and reinsuring sureties, as their interests may appear.

**SUIT FIFTEENTH:** Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgement upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising.

**OTHER INDEMNITY SIXTEENTH:** That the Contractor and the Indemnitors shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of the Contractor and the Indemnitors, accepted or released other agreements of indemnity or collateral in connection with the execution or procurement of said Bonds, from the Contractor or Indemnitors or others, it being expressly understood and agreed by the Contractor and the Indemnitors that any and all other rights which the Surety may have or acquire against the Contractor and the Indemnitors and/or others under any such other or additional agreements of indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement.

**INVALIDITY SEVENTEENTH:** In case any of the parties mentioned in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed. It is understood and agreed by the Contractor and Indemnitors that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Contractor and Indemnitors or others whether by the terms of any other agreement or by operation of law or otherwise.

**INDEMNITY WAIVER EIGHTEENTH:** The Indemnitors waive any defense that this instrument was executed subsequent to the date of any such bond, admitting and covenanting that such bond was executed pursuant to the Indemnitors' request and in reliance on the Indemnitors' promise to execute this instrument.

**ATTORNEY IN FACT NINETEENTH:** The Contractor and Indemnitors hereby irrevocably nominate, constitute, appoint and designate the Surety as their attorney-in-fact with the right, but not the obligation, to exercise all of the rights of the Contractor and Indemnitors assigned, transferred and set over to the Surety in the Agreement, and in the name of the Contractor and Indemnitors to make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be herein given to the Surety under all other provisions of this Agreement. The Contractor and Indemnitors hereby ratify and confirm all acts and actions taken and done by the Surety as such attorney-in-fact.

**TERMINATION TWENTIETH:** This Agreement may be terminated by the Contractor or Indemnitors upon twenty days written notice sent by registered mail to the Surety at its home office at Cedar Rapids, Iowa, but any such notice of termination shall not operate to modify, bar, or discharge the Contractor or the Indemnitors as to the Bonds that may have been theretofore executed.

**TWENTY-FIRST:** This Agreement may not be changed or modified orally. No change or modification shall be effective unless made by written endorsement executed to form a part hereof.

**For Acknowledgement of Contractor's Signature**

STATE OF Colorado )
                           ) ss:
COUNTY OF Adams )

On this 20 day of June , in the year 2011 , before me personally
come(s) Karen L. Tollefson

INDIVIDUAL ACKNOWLEDGEMENT: to me known and known to me to be the person(s) who (is) (are) described in and who executed the foregoing
instrument and acknowledge(s) to me that he executed the same.

PARTNERSHIP ACKNOWLEDGEMENT: a member of the co-partnership of _____
to me known and known to me to be the person who is described in and who executed the foregoing instrument, and acknowledges to me that he executed
the same as and for the act and deed of the said co-partnership.

CORPORATE ACKNOWLEDGEMENT: to me know, who, by me duly sworn, deposes and says that she reside in the City of Thornton
that she is the President _____ of Urban Farmer, Inc.
the corporation described in and which executed the foregoing instrument; that she know the seal of the said corporation; that the seal affixed to the said
instrument is such corporate seal; that it was so affixed by the order of the Board of Directors of said corporation, and that she signed her name thereto by
like order.

MY COMMISSION: ZARLENGO
**NOTARY PUBLIC**
**STATE OF COLORADO**

NOTARY PUBLIC (SIGNATURE AND TITLE OF OFFICAL TAKING ACKNOWLEDGMENT)

MY COMM EXP: 10-18-2014

**For Acknowledgment of Indemnitor's Signatures**

INDIVIDUAL ACKNOWLEDGEMENT

STATE OF Colorado )
                           ) ss:
COUNTY OF Adams )

On this 20 day of June , in the year 2011 , before me personally
come(s) Karen Tollefson, individually
to me known and known to me to be the person(s) who (is) (are) described in and who executed the foregoing instrument and acknowledge(s) to me that
she executed the SANDRA L ZARLENGO
MY COMMISSION EXPIRES **NOTARY PUBLIC**
**STATE OF COLORADO**

NOTARY PUBLIC (SIGNATURE AND TITLE OF OFFICIAL TAKING ACKNOWLEDGMENT)

MY COMM EXP: 10-18-14

INDIVIDUAL ACKNOWLEDGEMENT

STATE OF _____ )
                           ) ss:
COUNTY OF_____ )

On this _____ day of _____ , in the year _____ , before me personally
come(s)_____
to me known and known to me to be the person(s) who (is) (are) described in and who executed the foregoing instrument and acknowledge(s) to me that
they executed the same.
MY COMMISSION EXPIRES:

NOTARY PUBLIC (SIGNATURE AND TITLE OF OFFICIAL TAKING ACKNOWLEDGMENT)

PARTNERSHIP ACKNOWLEDGEMENT

STATE OF _____ )
                           ) ss:
COUNTY OF_____ )

On this _____ day of _____ , in the year _____ , before me personally
come(s)_____
a member of the co-partnership of _____
to me known and known to me to be the person who is described in and who executed the foregoing instrument and acknowledge(s) to me that he executed
the same as and for the act and deed of the said co-partnership.
MY COMMISSION EXPIRES:

NOTARY PUBLIC (SIGNATURE AND TITLE OF OFFICIAL TAKING ACKNOWLEDGMENT)

CORPORATE ACKNOWLEDGEMENT

STATE OF Colorado )
                           ) ss:
COUNTY OF Adams )

On this 20 day of June , in the year 2011 , before me personally
come(s) Karen Tollefson (UFI)
to me known, who, being by me duly sworn, deposes and says that he reside in the City of Thornton
that he is the Veo of UFI , the corporationdescribed in and which executed the foregoing instrument; that they know the seal of the said corporation; that
the seal affixed to the said instrument is such corporate seal; that is was so affixed by the order of the Board of Directors of said corporation, and that he
signed his name by ZARLENGO
MY COMMISSION EXPIRES **NOTARY PUBLIC**
**STATE OF COLORADO**

NOTARY PUBLIC (SIGNATURE AND TITLE OF OFFICIAL TAKING ACKNOWLEDGMENT)

MY COMM EXP: 10-18-14

IN WITNESS WHEREOF, we have hereunto set our hands and seals this 8th day of June, 2011:

ATTEST OR WITNESS:

Urban Farmer, Inc.
(FULL NAME & ADDRESS OF CONTRACTOR)

Thornton, CO

By: _Karen Tollefson, President_ (SEAL)

Karen L. Tollefson, President                                    (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

By: _Karen Tollefson_

Karen L. Tollefson, Individually                        (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

_____
(FULL NAME & ADDRESS OF INDEMNITOR)

_____ (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

_____
(FULL NAME & ADDRESS OF INDEMNITOR)

_____ (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

_____
(FULL NAME & ADDRESS OF INDEMNITOR)

_____ (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

_____
(FULL NAME & ADDRESS OF INDEMNITOR)

_____
(FULL NAME & ADDRESS OF INDEMNITOR)

BY: _____ (SEAL)

_____ (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

_____
(FULL NAME & ADDRESS OF INDEMNITOR)

BY: _____ (SEAL)

_____ (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

UNITED FIRE & CASUALTY COMPANY
(SURETY)

CEDAR RAPIDS, IOWA

By _____ (SEAL)
ATTORNEY-IN-FACT

06 bus 403

12/27/2005 1:05

# United Fire & Casualty Company
CEDAR RAPIDS, IOWA

## AGREEMENT OF INDEMNITY

We, the undersigned, hereinafter referred to as Indemnitors, hereby request UNITED FIRE & CASUALTY COMPANY, hereinafter referred to as Surety, to furnish instruments of suretyship, hereinafter referred to as Bonds, and as an inducement therefore we make the following representations of fact, promises and agreements:

**WITNESSETH:** WHEREAS, the Contractor, in the performance of contracts and the fulfillment of obligations generally, whether in its own name solely or as co-adventurer with others, may desire, or be required to give or procure certain bonds, or continue or substitute the same from time to time; or new bonds with the same or different penalties, and/or conditions, may be desired or required, in renewal, continuation, extension or substitution thereof; or the contractor or indemnitors may request the Surety to refrain from canceling said bonds; and

WHEREAS, at the request of the Contractor and the Indemnitors and upon the express understanding that this Agreement of Indemnity should be given, the Surety has executed and may from time to time hereafter execute said Bonds on behalf of the Contractor; and

WHEREAS, the Indemnitors have a substantial, material and beneficial interest in the obtaining of the Bonds or in the Surety's refraining from cancelling said Bonds.

NOW, THEREFORE, in consideration of the premises the Contractor and Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

**PREMIUMS** FIRST: The Contractor and Indemnitors will pay to the Surety all premiums and charges of the Surety for the Bonds until the Contractor or Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from the Bonds and all liability by reason thereof.

**INDEMNITY** SECOND: The Contractor and Indemnitors shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur; (1) By reason of having executed the Bonds, (2) By reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement. Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor. Such payment shall be equal to the amount of the reserve set by the Surety. In the event of any payment by the Surety the Contractor and Indemnitors further agree that in any accounting between the Surety and the Contractor, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith and in about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety.

**ASSIGNMENT** THIRD: The Contractor, the Indemnitors hereby consenting, will assign, transfer and set over, and does hereby assign, transfer and set over to the Surety, as collateral, to secure the obligations in any and all of the paragraphs of this Agreement and any other indebtedness and liabilities of the Contractor to the Surety, whether heretofore or hereafter incurred, the assignment in the case of each contract to become effective as of the date of the bond covering such contract, but only in the event of (1) any abandonment, forfeiture or breach of any contracts referred to in the Bonds or of any breach of any said Bonds; or (2) of any breach of the provisions of any of the paragraphs of this Agreement; or (3) of a default in discharging such other indebtedness or liabilities when due; or (4) of any assignment by the Contractor for the benefit of creditors, or of the appointment, or of any application for the appointment, of a receiver or trustee for the Contractor whether insolvent or not; or (5) of any proceeding which deprives the Contractor of the use of any of the machinery, equipment, plant, tools or material referred to in section (b) of this paragraph; or (6) of the Contractor's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Contractor be an individual: (a) All the rights of the Contractor in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; (b) All the rights, title and interest of the Contractor in and to all machinery, equipment, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of said sites; (c) All the rights, title and interest of the Contractor in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts; (d) All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any and all contracts referred to in the Bonds; and against any surety or sureties of any subcontractor, laborer, or materialman; (e) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.

**TRUST FUND** FOURTH: If any of the Bonds are executed in connection with a contract which by its terms or by law prohibits the assignment of the contract price, or any part thereof, the Contractor and Indemnitors covenant and agree that all payments received for or on account of said contract shall be held as a trust fund in which the Surety has an interest, for the payment of obligations incurred in the performance of the contract and for labor, materials, and services furnished in the prosecution of the work provided in said contract or any authorized extension or modification thereof; and, further, it is expressly understood and declared that all monies due and to become due under any contract or contracts covered by the Bonds are trust funds, whether in the possession of the Contractor or Indemnitors or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract or contracts for which the Surety would be liable under any of said Bonds, which said trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any said Bonds, and this Agreement and declaration shall also constitute notice of such trust.

**UNIFORM COMMERCIAL CODE** FIFTH: That this Agreement shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity.

**TAKEOVER** SIXTH: In the event of any breach, delay or default asserted by the obligee in any said Bonds, or the Contractor has suspended or ceased work on any contract or contracts covered by said Bonds, or failed to pay obligations incurred in connection therewith, or in the event of the death, disappearance, conviction for a felony, imprisonment, incompetency, insolvency, or bankruptcy of the Contractor, or the appointment of a receiver or trustee for the Contractor, or if any action is taken by or against the Contractor under or by virtue of the Bankruptcy Code, or should reorganization or arrangment proceedings be filed by or against the Contractor under said Code, or if any action is taken by or against the Contractor under the insolvency laws of any state, possession, or territory of the United States the Surety shall have the right, at its option and in its sole discretion and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession of any part or all of the work under any contract or contracts covered by any said Bonds, and at the expense of the Contractor and Indemnitors to complete or arrange for the completion of the same, and the Contractor and Indemnitors shall promptly, upon demand pay to the Surety all losses, and expenses so incurred.

UND-2024b (10-90)

**CHANGES** SEVENTH: The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors to assent to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or specifications accompanying said contracts, including, but not limited to, any change in the time for the completion of said contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefore, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of said Indemnitors.

**ADVANCES** EIGHTH: The Surety is authorized and empowered to guarantee loans, to advance or lend to the Contractor any money, which the Surety may see fit, for the purpose of any contracts referred to in, or guaranteed by the Bonds; and all money expended in the completion of any such contracts by the Surety, or lent or advanced from time to time to the Contractor, or guaranteed by the Surety for the purposes of any such contracts, and all costs, and expenses incurred by the Surety in relation thereto, unless repaid with legal interest by the Contractor to the Surety when due, shall be presumed to be a loss by the Surety for which the Contractor and the Indemnitors shall be responsible, notwithstanding that said money or any part thereof should not be so used by the Contractor.

**BOOKS AND RECORDS**:NINTH: At any time, and until such time as the liability of the Surety under any and all said Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Contractor and Indemnitors; and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including, but not limited to, the status of the work under contracts being performed by the Contractor, the condition of the performance of such contracts and payments of accounts.

**DECLINE EXECUTION** TENTH: Unless otherwise specifically agreed in writing, the Surety may decline to execute any Bond and the Contractor and Indemnitors agree to make no claim to the contrary in consideration of the Surety's receiving this Agreement; and if the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any and all of the bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond.

**NOTICE OF EXECUTION** ELEVENTH: The Indemnitors hereby waive notice of the execution of said Bonds and of the acceptance of this Agreement, and the Contractor and the Indemnitors hereby waive all notice of any default, or any other act or acts giving rise to any claim under said Bonds, as well as notice of any and all liability of the Surety under said Bonds, and any and all liability on their part hereunder, to the end and effect that, the Contractor and the Indemnitors shall be and continue liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might have been entitled to make.

**HOMESTEAD** TWELFTH: The Contractor and the Indemnitors hereby waive, so far as their respective obligations under this Agreement are concerned, all rights to claim any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any State, Territory, or Possession.

**SETTLEMENTS** THIRTEENTH: The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment upon the Bonds, unless the Contractor and the Indemnitors shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount, to be used in paying any judgment or judgments rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety.

**SURETIES** FOURTEENTH: In the event the Surety procures the execution of the Bonds by other sureties, or executes the Bonds with co-sureties, or reinsures any portion of said Bonds with reinsuring sureties, then all the terms and conditions of this Agreement shall inure to the benefit of such other sureties, co-sureties and reinsuring sureties, as their interests may appear.

**SUITS** FIFTEENTH: Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising.

**OTHER INDEMNITY** SIXTEENTH: That the Contractor and the Indemnitors shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or herafter, with or without notice to or knowledge of the Contractor and the Indemnitors, accepted or released other agreements of indemnity or collateral in connection with the execution or procurement of said Bonds, from the Contractor or Indemnitors or others, it being expressly understood and agreed by the Contractor and the Indemnitors that any and all other rights which the Surety may have or acquire against the Contractor and the Indemnitors and/or others under any such other or additional agreements of indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement.

**INVALIDITY** SEVENTEENTH: In case any of the parties mentioned in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed. It is understood and agreed by the Contractor and Indemnitors that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Contractor and Indemnitors or others whether by the terms of any other agreement or by operation of law or otherwise.

**INDEMNITY WAIVER** EIGHTEENTH: The Indemnitors waive any defense that this instrument was executed subsequent to the date of any such bond, admitting and covenanting that such bond was executed pursuant to the Indemnitors' request and in reliance on the Indemnitors' promise to execute this instrument.

**ATTORNEY IN FACT** NINETEENTH: The Contractor and Indemnitors hereby irrevocably nominate, constitute, appoint and designate the Surety as their attorney-in-fact with the right, but not the obligation, to exercise all of the rights of the Contractor and Indemnitors assigned, transferred and set over to the Surety in this Agreement, and in the name of the Contractor and Indemnitors to make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be herein given to the Surety under all other provisions of this Agreement. The Contractor and Indemnitors hereby ratify and confirm all acts and actions taken and done by the Surety as such attorney-in-fact.

**TERMINATION** TWENTIETH: This Agreement may be terminated by the Contractor or Indemnitors upon twenty days written notice sent by registered mail to the Surety at its home office at Cedar Rapids, Iowa, but any such notice of termination shall not operate to modify, bar, or discharge the Contractor or the Indemnitors as to the Bonds that may have been theretofore executed.

TWENTY—FIRST: This Agreement may not be changed or modified orally. No change or modification shall be effective unless made by written endorsement executed to form a part hereof.

12/27

**For Acknowledgment of Contractor's Signature**

STATE OF __Colorado__
COUNTY OF __Adams__ } ss:
On this __1st__ day of __December__, in the year 19 __2005__, before me personally come(s)
__David L. Tollefson__,

**INDIVIDUAL ACKNOWLEDGMENT:** to me known and known to me to be the person(s) who (is) (are) described in and who executed the foregoing instrument and acknowledge(s) to me that _____ he _____ executed the same.

**PARTNERSHIP ACKNOWLEDGEMENT:** a member of the co-partnership of _____
to me known and known to me to be the person who is described in and who executed the foregoing instrument, and acknowledges to me that he executed the same as and for the act and deed of the said co-partnership.

**CORPORATE ACKNOWLEDGMENT:** to me known, who, being by me duly sworn, deposes and says that he resides in the City of __Thornton__
that he is the __President__ of the __Urban Farmer, Inc.__
the corporation described in and which executed the foregoing instrument; that he knows the seal of the said corporation; that the seal affixed to the said instrument is such corporate seal; that it was so affixed by the order of the Board of Directors of said corporation; and that he signed his name thereto by like order.

(SIGNATURE AND TITLE OF OFFICIAL TAKING ACKNOWLEDGMENT)

CATHY L. BOLGER
NOTARY PUBLIC
STATE OF COLORADO
My Commission Expires 09/28/2009

**For Acknowledgment of Indemnitor's Signatures**

**INDIVIDUAL ACKNOWLEDGMENT**

STATE OF __Colorado__
COUNTY OR __Adams__ } ss:
On this __1st__ day of __December__, in the year 19 __2005__, before me personally come(s)
__David L. Tollefson, Karen L. Tollefson, Individually__,
to me known and known to me to be the person(s) who (is) (are) described in and who executed the foregoing instrument and acknowledge(s) to me that __t hey__ executed the same.

(SIGNATURE AND TITLE OF OFFICIAL TAKING ACKNOWLEDGMENT)

CATHY L. BOLGER
NOTARY PUBLIC
STATE OF COLORADO
My Commission Expires 09/28/2009

**INDIVIDUAL ACKNOWLEDGMENT**

STATE OF _____
COUNTY OF _____ } ss:
On this _____ day of _____, in the year 19 _____, before me personally come(s)
_____,
to me known and known to me to be the person(s) who (is) (are) described in and who executed the foregoing instrument and acknowledge(s) to me that _____ he _____ executed the same.

_____
(SIGNATURE AND TITLE OF OFFICIAL TAKING ACKNOWLEDGMENT)

**PARTNERSHIP ACKNOWLEDGMENT**

STATE OF _____
COUNTY OF _____ } ss:
On this _____ day of _____, in the year 19 _____, before me personally comes
_____,
a member of the co-partnership of _____
to me known and known to me to be the person who is described in and who executed the foregoing instrument, and acknowledges to me that he executed the same as and for the act and deed of the said co-partnership.

_____
(SIGNATURE AND TITLE OF OFFICIAL TAKING ACKNOWLEDGMENT)

**CORPORATE ACKNOWLEDGMENT**

STATE OF _____
COUNTY OF _____ } ss:
On this _____ day of _____, in the year 19 _____, before me personally comes
_____,
to me known, who, being by me duly sworn, deposes and says that he resides in the City of _____
that he is the _____ of the _____
the corporation described in and which executed the foregoing instrument; that he knows the seal of the said corporation; that the seal affixed to the said instrument is such corporate seal; that it was so affixed by the order of the Board of Directors of said corporation, and that he signed his name thereto by like order.

_____
(SIGNATURE AND TITLE OF OFFICIAL TAKING ACKNOWLEDGMENT)

IN WITNESS WHEREOF, we have hereunto set our hands and seals this _1st._ day of _December_ _19_2005 .

ATTEST OR WITNESS:

_URBAN FARMER, INC._ _3431 E. 86th Ave., Thornton,_
(FULL NAME & ADDRESS OF CONTRACTOR) CO  80229

By _____

_David L. Tollefson, President_
(FULL NAME & ADDRESS OF INDEMNITOR)

By: _____

_David L. Tollefson, Individually_
(FULL NAME & ADDRESS OF INDEMNITOR)

By: _____

_Karen L. Tollefson, Individually_
(FULL NAME & ADDRESS OF INDEMNITOR)

By _____ (SEAL)

_____ (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

_____ (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

_____
(FULL NAME & ADDRESS OF INDEMNITOR)

By _____ (SEAL)

_____ (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

_____ (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

_____
(FULL NAME & ADDRESS OF INDEMNITOR)

By _____ (SEAL)

_____ (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

_____ (SEAL)
(FULL NAME & ADDRESS OF INDEMNITOR)

_____
(FULL NAME & ADDRESS OF INDEMNITOR)

## UNITED FIRE & CASUALTY COMPANY
(SURETY)

By _____ (SEAL)

UND-2024b (10-90)

**Schedule 1**

RECEPTION#: 2009000064537, 08/28/2009 at 01:47:07 PM, 1 OF 7,   TD Pgs: 0 Doc
Type:DT Karen Long, Adams County, CO

RECORDATION REQUESTED BY:
Citywide Banks
PO Box 128
Aurora, CO 80040-0128

WHEN RECORDED MAIL TO:
Citywide Banks
PO Box 128
Aurora, CO 80040

_____ FOR RECORDER'S USE ONLY

## DEED OF TRUST

**MAXIMUM PRINCIPAL AMOUNT SECURED.** The Lien of this Deed of Trust shall not exceed at any one time $2,500,000.00 except as allowed under applicable Colorado law.

THIS **DEED OF TRUST** is dated August 25, 2009, among DKR Land Development Enterprises, LLC, a Colorado limited liability company, whose address is 7912 Orion Way, Arvada, CO  80007-7876 ("Grantor"); Citywide Banks, whose address is PO Box 128, Aurora, CO  80040-0128 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and the Public Trustee of Adams County, Colorado (referred to below as "Trustee").

**CONVEYANCE AND GRANT.** For valuable consideration, Grantor hereby irrevocably grants, transfers and assigns to Trustee for the benefit of Lender as Beneficiary all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in Adams County, State of Colorado:

Lot 3, Block 1, Newcastle Subdivision, County of Adams, State of Colorado

The **Real Property** or its address is commonly known as  3431 E. 96th Avenue, Thornton, CO 80229-6200.

**REVOLVING LINE OF CREDIT.** This Deed of Trust secures the indebtedness including, without limitation, a revolving line of credit, which obligates Lender to make advances to Borrower so long as Borrower complies with all the terms of the Note.

Grantor presently assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property.  In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE  (A)  PAYMENT OF THE INDEBTEDNESS AND  (B)  PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST.  THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that:  (a) this Deed of Trust is executed at Borrower's request and not at the request of Lender;  (b) Grantor has the full power, right, and authority to enter into this Deed of Trust and to hypothecate the Property;  (c) the provisions of this Deed of Trust do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor;  (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and  (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

**GRANTOR'S WAIVERS.** Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Deed of Trust, Borrower shall pay to Lender all Indebtedness secured by this Deed of Trust as it becomes due, and Borrower and Grantor shall perform all their respective obligations under the Note, this Deed of Trust, and the Related Documents.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may  (1)  remain in possession and control of the Property;  (2)  use, operate or manage the Property; and  (3)  collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that:  (1)  During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property;  (2)  Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing,  (a)  any breach or violation of any Environmental Laws,  (b)  any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or  (c)  any actual or threatened litigation or claims of any kind by any person relating to such matters; and  (3)  Except as previously disclosed to and acknowledged by Lender in writing,  (a)  neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and  (b)  any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust.  Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person.  The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances.  Grantor hereby  (1)  releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and  (2)  agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender

| Loan No: 200117772 | DEED OF TRUST<br>(Continued) | Page 2 |
|---|---|---|

may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Deed of Trust, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Trustee and Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption, and boiler insurance, as Lender may reasonably require. Policies shall be written in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Deed of Trust or any Related Documents, including but not limited to Grantor's

RECEPTION#: 2009000064537, 08/28/2009 at 01:47:07 PM, 3 OF 7, Doc Type:DT TD
Pages: 0 Karen Long, Adams County, CO

failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Deed of Trust or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and (b) Grantor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Trustee or Lender under this Deed of Trust, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Deed of Trust:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Deed of Trust:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Deed of Trust and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Deed of Trust.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (3) a tax on this type of Deed of Trust chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Deed of Trust, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Deed of Trust in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Deed of Trust as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Note, this Deed of Trust, and the Related Documents, and (2) the liens and security interests created by this Deed of Trust as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with

RECEPTION#: 2009000064537, 08/28/2009 at 01:47:07 PM, 4 OF 7, Doc Type:DT TD
Pages: 0 Karen Long, Adams County, CO

| Loan No: 200117772 | DEED OF TRUST (Continued) | Page 4 |
| --- | --- | --- |

the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** Upon the full performance of all the obligations under the Note and this Deed of Trust, Trustee may, upon production of documents and fees as required under applicable law, release this Deed of Trust, and such release shall constitute a release of the lien for all such additional sums and expenditures made pursuant to this Deed of Trust. Lender agrees to cooperate with Grantor in obtaining such release and releasing the other collateral securing the Indebtedness. Any release fees required by law shall be paid by Grantor, if permitted by applicable law.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Deed of Trust:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Deed of Trust or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Compliance Default.** Failure to comply with any other term, obligation, covenant or condition contained in this Deed of Trust, the Note or in any of the Related Documents.

**Default on Other Payments.** Failure of Grantor within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's ability to repay the Indebtedness or Borrower's or Grantor's ability to perform their respective obligations under this Deed of Trust or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Deed of Trust or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Deed of Trust or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution or termination of Borrower's or Grantor's existence as a going business, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Borrower or Grantor under the terms of any other agreement between Borrower and Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Borrower or Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's or Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Deed of Trust, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Borrower or Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty which Borrower would be required to pay.

**Foreclosure.** Lender shall have the right to cause all or any part of the Real Property, and Personal Property, if Lender decides to proceed against it as if it were real property, to be sold by the Trustee according to the laws of the State of Colorado as respects foreclosures against real property. The Trustee shall give notice in accordance with the laws of Colorado. The Trustee shall apply the proceeds of the sale in the following order: (a) to all costs and expense of the sale, including but not limited to Trustee's fees, attorneys' fees, and the cost of title evidence; (b) to all sums secured by this Deed of Trust; and (c) the excess, if any, to the person or persons legally entitled to the excess.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor to take possession of and manage the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify

RECEPTION#: 2009000064537, 08/28/2009 at 01:47:07 PM, 5 OF 7, Doc Type:DT TD
Pages: 0 Karen Long, Adams County, CO

| | **DEED OF TRUST** | |
|---|---|---|
| Loan No: 200117772 | **(Continued)** | **Page 5** |

a person from serving as a receiver. Receiver may be appointed by a court of competent jurisdiction upon ex parte application and without notice, notice being expressly waived.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Borrower or Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Note or available at law or in equity.

**Sale of the Property.** In exercising its rights and remedies, Lender shall be free to designate on or before it files a notice of election and demand with the Trustee, that the Trustee sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property. Upon any sale of the Property, whether made under a power of sale granted in this Deed of Trust or pursuant to judicial proceedings, if the holder of the Note is a purchaser at such sale, it shall be entitled to use and apply all, or any portion of, the indebtedness for or in settlement or payment of all, or any portion of, the purchase price of the Property purchased, and, in such case, this Deed of Trust, the Note, and any documents evidencing expenditures secured by this Deed of Trust shall be presented to the person conducting the sale in order that the amount of indebtedness so used or applied may be credited thereon as having been paid.

**Attorneys' Fees; Expenses.** If Lender forecloses or institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**Rights of Trustee.** To the extent permitted by applicable law, Trustee shall have all of the rights and duties of Lender as set forth in this section.

**NOTICES.** Any notice required to be given under this Deed of Trust, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. All copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust shall be sent to Lender's address, as shown near the beginning of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** This Deed of Trust, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Governing Law.** This Deed of Trust will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Colorado without regard to its conflicts of law provisions. This Deed of Trust has been accepted by Lender in the State of Colorado.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Deed of Trust shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Grantor signing below is responsible for all obligations in this Deed of Trust. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Deed of Trust.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Deed of Trust, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Deed of Trust to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Grantor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Deed of Trust and the indebtedness by way of forbearance or extension without releasing Grantor from the

RECEPTION#: 2009000064537, 08/28/2009 at 01:47:07 PM, 6 OF 7, Doc Type:DT TD
Pages: 0 Karen Long, Adams County, CO

| Loan No: 200117772 | DEED OF TRUST (Continued) | Page 6 |
|---|---|---|

obligations of this Deed of Trust or liability under the Indebtedness.

**Time Is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Colorado as to all indebtedness secured by this Deed of Trust.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Deed of Trust. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Deed of Trust shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Beneficiary.** The word "Beneficiary" means Citywide Banks, and its successors and assigns.

**Borrower.** The word "Borrower" means The Urban Farmer Inc., David L. Tollefson and Karen L. Tollefson and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Grantor, Lender, and Trustee, and includes without limitation all assignment and security interest provisions relating to the Personal Property and Rents.

**Default.** The word "Default" means the Default set forth in this Deed of Trust in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Grantor.** The word "Grantor" means DKR Land Development Enterprises, LLC, a Colorado limited liability company.

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Trustee or Lender to enforce Grantor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

**Lender.** The word "Lender" means Citywide Banks, its successors and assigns.

**Note.** The word "Note" means the promissory note dated August 25, 2009, in the original principal amount of $2,500,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. NOTICE TO GRANTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**Trustee.** The word "Trustee" means the Public Trustee of Adams County, Colorado.

RECEPTION#: 2009000064537, 08/28/2009 at 01:47:07 PM, 7 OF 7, Doc Type:DT TD
Pages: 0 Karen Long, Adams County, CO

| Loan No: 200117772 | DEED OF TRUST (Continued) | Page 7 |

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

DKR LAND DEVELOPMENT ENTERPRISES, LLC, A COLORADO LIMITED LIABILITY COMPANY

By: _____
   David V. Tollefson, Manager of DKR Land Development Enterprises, LLC, a
   Colorado limited liability company

By: _____
   Karen L. Tollefson, Manager of DKR Land Development Enterprises, LLC, a
   Colorado limited liability company

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE OF ___Colorado___        )
                               ) SS
COUNTY OF ___Arapahoe___       )

On this ___25th___ day of ___August___, 20_07_, before me, the undersigned Notary Public, personally appeared David L. Tollefson, Manager of DKR Land Development Enterprises, LLC, a Colorado limited liability company and Karen L. Tollefson, Manager of DKR Land Development Enterprises, LLC, a Colorado limited liability company, and known to me to be members or designated agents of the limited liability company that executed the Deed of Trust and acknowledged the Deed of Trust to be the free and voluntary act and deed of the limited liability company, by authority of statute, its articles of organization or its operating agreement, for the uses and purposes therein mentioned, and on oath stated that they are authorized to execute this Deed of Trust and in fact executed the Deed of Trust on behalf of the limited liability company.

By: _____   Residing at ___Aurora CO___

Notary Public in and for the State of ___Colorado___   My commission expires ~~My Commission Expires 03/08/2012~~

LASER PRO Lending, Ver. 5.45.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2009.   All Rights Reserved.   - CO
G:\CFIWIN\CFI\LPL\G01.FC TR-30034 PR-CMLSECLT

# BUSINESS LOAN AGREEMENT (ASSET BASED)

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,300,000.00 | 12-15-2012 | 06-15-2013 | 200117772 | 4A / 45 | UAA0189 | MCH | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** The Urban Farmer Inc.
Karen L. Tollefson
3431 E. 86th Avenue
Thornton, CO 80229-5200

**Lender:** Citywide Banks
PO Box 128
Aurora, CO 80040-0128
(303) 365-3600

THIS BUSINESS LOAN AGREEMENT (ASSET BASED) dated December 15, 2012, is made and executed between The Urban Farmer Inc. and Karen L. Tollefson ("Borrower") and Citywide Banks ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of December 15, 2012, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Karen L. Tollefson, President of The Urban Farmer Inc.

**LINE OF CREDIT.** Lender agrees to make Advances to Borrower from time to time from the date of this Agreement to the Expiration Date, provided the aggregate amount of such Advances outstanding at any time does not exceed the Borrowing Base. Within the foregoing limits, Borrower may borrow, partially or wholly prepay, and reborrow under this Agreement as follows:

**Conditions Precedent to Each Advance.** Lender's obligation to make any Advance to or for the account of Borrower under this Agreement is subject to the following conditions precedent, with all documents, instruments, opinions, reports, and other items required under this Agreement to be in form and substance satisfactory to Lender:

(1) Lender shall have received evidence that this Agreement and all Related Documents have been duly authorized, executed, and delivered by Borrower to Lender.

(2) Lender shall have received such opinions of counsel, supplemental opinions, and documents as Lender may request.

(3) The security interests in the Collateral shall have been duly authorized, created, and perfected with first lien priority and shall be in full force and effect.

(4) All guaranties required by Lender for the credit facility(ies) shall have been executed by each Guarantor, delivered to Lender, and be in full force and effect.

(5) Lender, at its option and for its sole benefit, shall have conducted an audit of Borrower's Accounts, books, records, and operations, and Lender shall be satisfied as to their condition.

(6) Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

(7) There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement, and Borrower shall have delivered to Lender the compliance certificate called for in the paragraph below titled "Compliance Certificate."

**Making Loan Advances.** Advances under this credit facility, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by authorized persons. Lender may, but need not, require that all oral requests be confirmed in writing. Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of Borrower (1) when credited to any deposit account of Borrower maintained with Lender or (2) when advanced in accordance with the instructions of an authorized person. Lender, at its option, may set a cutoff time, after which all requests for Advances will be treated as having been requested on the next succeeding Business Day.

**Mandatory Loan Repayments.** If at any time the aggregate principal amount of the outstanding Advances shall exceed the applicable Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances and the Borrowing Base. On the Expiration Date, Borrower shall pay to Lender in full the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, not yet paid.

**Loan Account.** Lender shall maintain on its books a record of account in which Lender shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the credit facility. Lender shall provide Borrower with periodic statements of Borrower's account, which statements shall be considered to be correct and conclusively binding on Borrower unless Borrower notifies Lender to the contrary within thirty (30) days after Borrower's receipt of any such statement which Borrower deems to be incorrect.

**COLLATERAL.** To secure payment of the Primary Credit Facility and performance of all other Loans, obligations and duties owed by Borrower to Lender, Borrower (and others, if required) shall grant to Lender Security Interests in such property and assets as Lender may require. Lender's Security Interests in the Collateral shall be continuing liens and shall include the proceeds and products of the Collateral, including without limitation the proceeds of any insurance. With respect to the Collateral, Borrower agrees and represents and warrants to Lender:

**Perfection of Security Interests.** Borrower agrees to execute all documents perfecting Lender's Security Interest and to take whatever actions are requested by Lender to perfect and continue Lender's Security Interests in the Collateral. Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. Contemporaneous with the execution of this Agreement, Borrower will execute one or more UCC financing statements and any similar statements as may be required by applicable law, and Lender will file such financing statements and all such similar statements in the appropriate location or locations. Borrower hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue any Security Interest. Lender may at any time, and without further authorization from Borrower, file a carbon, photograph, facsimile, or other reproduction of any financing statement for use as a financing statement. Borrower will reimburse Lender for all expenses for the perfection, termination, and the continuation of the perfection of Lender's security interest in the Collateral. Borrower promptly will notify Lender before any change in Borrower's name including any change to the assumed business names of Borrower. Borrower also promptly will notify Lender before any change in Borrower's Social Security Number or Employer Identification Number. Borrower further agrees to notify Lender in writing prior to any change in address or location of Borrower's principal governance office or should Borrower merge or consolidate with any other entity.

**Collateral Records.** Borrower does now, and at all times hereafter shall, keep correct and accurate records of the Collateral, all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time. With respect to the Accounts, Borrower agrees to keep and maintain such records as Lender may require, including without limitation information concerning Eligible Accounts and Account balances and agings. Records related to Accounts (Receivables) are or will be located at 3431 E 86th Ave., Thornton, CO 80229-5200. The above is an accurate and complete list of all locations at which Borrower keeps or maintains business records concerning Borrower's collateral.

**Collateral Schedules.** Concurrently with the execution and delivery of this Agreement, Borrower shall execute and deliver to Lender schedules of Accounts and schedules of Eligible Accounts in form and substance satisfactory to the Lender. Thereafter supplemental schedules shall be delivered according to the following schedule: With respect to Eligible Accounts, schedules shall be delivered Monthly.

**Representations and Warranties Concerning Accounts.** With respect to the Accounts, Borrower represents and warrants to Lender: (1) Each Account represented by Borrower to be an Eligible Account for purposes of this Agreement conforms to the requirements of the definition of an Eligible Account; (2) All Account information listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; and (3) Lender, its assigns, or agents shall have the right at any time and at Borrower's expense to inspect, examine, and audit Borrower's records and to confirm with Account Debtors the accuracy of such Accounts.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
Loan No: 200117772                          (Continued)                          Page 2

---

Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Fees and Expenses Under This Agreement.** Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**MULTIPLE BORROWERS.** This Agreement has been executed by multiple obligors who are referred to in this Agreement individually, collectively and interchangeably as "Borrower." Unless specifically stated to the contrary, the word "Borrower" as used in this Agreement, including without limitation all representations, warranties and covenants, shall include all Borrowers. Borrower understands and agrees that, with or without notice to any one Borrower, Lender may (A) make one or more additional secured or unsecured loans or otherwise extend additional credit with respect to any other Borrower; (B) with respect to any other Borrower alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; (C) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral; (D) release, substitute, agree not to sue, or deal with any one or more of Borrower's or any other Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) determine how, when and what application of payments and credits shall be made on any Indebtedness; (F) apply such security and direct the order or manner of sale of any Collateral, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) sell, transfer, assign or grant participations in all or any part of the Loan; (H) exercise or refrain from exercising any rights against Borrower or others, or otherwise act or refrain from acting; (I) settle or compromise any Indebtedness; and (J) subordinate the payment of all or any part of any of Borrower's Indebtedness to Lender to the payment of any liabilities which may be due Lender or others.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** The Urban Farmer Inc. is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Colorado. The Urban Farmer Inc. is duly authorized to transact business in all other states in which The Urban Farmer Inc. is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which The Urban Farmer Inc. is doing business. Specifically, The Urban Farmer Inc. is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. The Urban Farmer Inc. has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. The Urban Farmer Inc. maintains an office at 3431 E. 86th Avenue, Thornton, CO 80229-5200. Unless The Urban Farmer Inc. has designated otherwise in writing, the principal office is the office at which The Urban Farmer Inc. keeps its books and records including its records concerning the Collateral. The Urban Farmer Inc. will notify Lender prior to any change in the location of The Urban Farmer Inc.'s state of organization or any change in The Urban Farmer Inc.'s name. The Urban Farmer Inc. shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to The Urban Farmer Inc. and The Urban Farmer Inc.'s business activities.

Karen L. Tollefson maintains an office at 7912 Orion Way, Arvada, CO 80007-7876. Unless Karen L. Tollefson has designated otherwise in writing, the principal office is the office at which Karen L. Tollefson keeps its books and records including its records concerning the Collateral. Karen L. Tollefson will notify Lender prior to any change in the location of Karen L. Tollefson's principal office address or any change in Karen L. Tollefson's name. Karen L. Tollefson shall do all things necessary to comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Karen L. Tollefson and Karen L. Tollefson's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than ninety (90) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, audited by a certified public accountant satisfactory to Lender.

**Interim Statements.** As soon as available, but in no event later than sixty (60) days after the end of each month, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

**Tax Returns.** As soon as available, but in no event later than ninety (90) days after the applicable filing date for the tax reporting period ended, Borrower's Federal and other governmental tax returns, prepared by Borrower.

**Additional Requirements.** 1) Annual Budget or Projection for upcoming year; 2) Annual Tax Return for DKR Land Development Enterprises, LLC; and 3) Monthly Financials to include Balance Sheet, Income Statement, Accounts Receivable and Accounts Payable Aging Reports, Statement of Contracts and signed Borrowing Base Report

Co-Borrower to submit to Lender Annual Personal Financial Statements and Annual Personal Tax Returns within 90 days.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Financial Covenants and Ratios.** Comply with the following covenants and ratios:

**Tangible Net Worth Requirements.** Maintain a minimum Tangible Net Worth of not less than: $2,000,000.00. In addition, Borrower shall comply with the following net worth ratio requirements:

**Debt / Worth Ratio.** Maintain a ratio of Debt / Worth not in excess of 3.000 to 1.000. The ratio "Debt / Worth" means Borrower's Total Liabilities divided by Borrower's Tangible Net Worth. This leverage ratio should be maintained at all times and may be evaluated at any time.

Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property

owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.**  Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.**  If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.**  Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.**  (1)  Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases,  (2)  sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or  (3)  sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.**  (1)  Engage in any business activities substantially different than those in which Borrower is presently engaged, (2)  cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or  (3)  pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.**  (1)  Loan, invest in or advance money or assets to any other person, enterprise or entity,  (2) purchase, create or acquire any interest in any other enterprise or entity, or  (3)  incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.**  Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.**  If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if:  (A)  Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender;  (B)  Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt;  (C)  there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or  (D)  any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or  (E)  Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.**  To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**DEFAULT.**  Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.**  Borrower fails to make any payment when due under the Loan.

**Other Defaults.**  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.**  Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.**  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.**  The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.**  This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.**  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.**  Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change in Ownership.**  Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.**  A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.**  Lender in good faith believes itself insecure.

**EFFECT OF AN EVENT OF DEFAULT.**  If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**BUSINESS LOAN AGREEMENT (ASSET BASED)**

| Loan No: 200117772 | (Continued) | Page 5 |
|---|---|---|

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's reasonable costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the reasonable costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Colorado without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Colorado.

**Joint and Several Liability.** All obligations of Borrower under this Agreement shall be joint and several, and all references to Borrower shall mean each and every Borrower. This means that each Borrower signing below is responsible for all obligations in this Agreement. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any person or circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other person or circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Account.** The word "Account" means a trade account, account receivable, other receivable, or other right to payment for goods sold or services rendered owing to Borrower (or to a third party grantor acceptable to Lender).

**Account Debtor.** The words "Account Debtor" mean the person or entity obligated upon an Account.

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement (Asset Based), as this Business Loan Agreement (Asset Based) may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement (Asset Based) from time to time.

**Borrower.** The word "Borrower" means The Urban Farmer Inc. and Karen L. Tollefson and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Borrowing Base.** The words "Borrowing Base" mean The words "Borrowing Base adherence will be waived with this extension but will continue to be required for reporting purposes using the following formula: 75% of Accounts Receivable <91 days old, including Bonded Receivables <91 days old, plus 50% of the aggregate amount of Eligibale Inventory."

**Business Day.** The words "Business Day" mean a day on which commercial banks are open in the State of Colorado.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust,

factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise. The word Collateral also includes without limitation all collateral described in the Collateral section of this Agreement.

**Eligible Accounts.** The words "Eligible Accounts" mean at any time, all of Borrower's Accounts which contain selling terms and conditions acceptable to Lender. The net amount of any Eligible Account against which Borrower may borrow shall exclude all returns, discounts, credits, and offsets of any nature. Unless otherwise agreed to by Lender in writing, Eligible Accounts do not include:

    (1) Accounts with respect to which the Account Debtor is employee or agent of Borrower.

    (2) Accounts with respect to which the Account Debtor is a subsidiary of, or affiliated with Borrower or its shareholders, officers, or directors.

    (3) Accounts with respect to which goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Account Debtor may be conditional.

    (4) Accounts with respect to which Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to Borrower.

    (5) Accounts which are subject to dispute, counterclaim, or setoff.

    (6) Accounts with respect to which the goods have not been shipped or delivered, or the services have not been rendered, to the Account Debtor.

    (7) Accounts with respect to which Lender, in its sole discretion, deems the creditworthiness or financial condition of the Account Debtor to be unsatisfactory.

    (8) Accounts of any Account Debtor who has filed or has had filed against it a petition in bankruptcy or an application for relief under any provision of any state or federal bankruptcy, insolvency, or debtor-in-relief acts; or who has had appointed a trustee, custodian, or receiver for the assets of such Account Debtor; or who has made an assignment for the benefit of creditors or has become insolvent or fails generally to pay its debts (including its payrolls) as such debts become due.

    (9) Accounts which have not been paid in full within 90 from the invoice date.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Expiration Date.** The words "Expiration Date" mean the date of termination of Lender's commitment to lend under this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Citywide Banks, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means Original Promissory Note in the amount of $2,500,000.00 dated August 25, 2009.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Primary Credit Facility.** The words "Primary Credit Facility" mean the credit facility described in the Line of Credit section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**Tangible Net Worth.** The words "Tangible Net Worth" mean Borrower's total assets excluding all intangible assets (i.e., goodwill, trademarks, patents, copyrights, organizational expenses, and similar intangible items, but including leaseholds and leasehold improvements) less total debt.

Loan No: 200117772

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Page 7

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT (ASSET BASED) AND BORROWER AGREES TO ITS TERMS.  THIS BUSINESS LOAN AGREEMENT (ASSET BASED) IS DATED DECEMBER 15, 2012.

BORROWER:

THE URBAN FARMER INC.

By: _____
    Karen L. Tollefson, President of The Urban Farmer
    Inc.

X _____
    Karen L. Tollefson, Individually

LENDER:

CITYWIDE BANKS

By: _____
    Authorized Officer

LASER PRO Lending, Ver. 12.3.0.004  Copr. Harland Financial Solutions, Inc. 1997, 2012.  All Rights Reserved.  - CO  G:\CFI\WIN\CFI\LPL\C40.FC  TR-38041  PR-CMULTCHG

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $2,300,000.00 | 12-15-2012 | 06-15-2013 | 200117772 | 4A / 45 | UAA0189 | MCH | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** The Urban Farmer Inc.
Karen L. Tollefson
3431 E. 86th Avenue
Thornton, CO 80229-5200

**Lender:** Citywide Banks
PO Box 128
Aurora, CO 80040-0128
(303) 365-3600

---

**Principal Amount: $2,300,000.00**　　　　　　　　　　　　　**Date of Agreement: December 15, 2012**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** Original Promissory Note in the amount of $2,500,000.00 dated August 25, 2009.

**DESCRIPTION OF COLLATERAL.** All Inventory, Accounts, Equipment, Instruments and General Intangibles
3rd Deed of Trust on property located at 3431 East 86th Avenue, Thornton, CO 80229-5200 (4 Lots)
UCC Real Estate Fixtures.

**DESCRIPTION OF CHANGE IN TERMS.** Effective December 15, 2012 the term of the Note is extended to June 15, 2013.

**PROMISE TO PAY.** The Urban Farmer Inc. and Karen L. Tollefson ("Borrower") jointly and severally promise to pay to Citywide Banks ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Million Three Hundred Thousand & 00/100 Dollars ($2,300,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on June 15, 2013. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning January 15, 2013, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the The Prime Rate as Published in the Wall Street Journal (the "Index"). The index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute Index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each Day. Borrower understands that Lender may make loans based on other rates as well. The index currently is 3.250% per annum. Interest on the unpaid principal balance of this loan will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 1.500 percentage points over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 6.000% per annum based on a year of 360 days. NOTICE: Under no circumstances will the interest rate on this loan be less than 6.000% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.** Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Agreement, Borrower understands that Lender is entitled to a minimum interest charge of $25.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Citywide Banks, PO Box 128, Aurora, CO 80040-0128.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.** Upon default, at Lender's option, and if permitted by applicable law, Lender may add any unpaid accrued interest to principal and such sum will bear interest therefrom until paid at the rate provided in this Agreement (including any increased rate). Upon default, the interest rate on this loan shall be increased to 21.000% per annum based on a year of 360 days. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

　　**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

　　**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

　　**Default in Favor of Third Parties.** Borrower defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or ability to perform Borrower's obligations under this Agreement or any of the Related Documents.

　　**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

　　**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

　　**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the indebtedness. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

　　**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness evidenced by this Note.

　　**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

　　**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

　　**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Agreement and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Agreement if Borrower does not pay. Borrower will pay Lender the reasonable costs of such collection. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including without limitation attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

## CHANGE IN TERMS AGREEMENT
### (Continued)

| Loan No: 200117772 | | Page 2 |
|---|---|---|

**GOVERNING LAW.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Colorado without regard to its conflicts of laws provisions. This Agreement has been accepted by Lender in the State of Colorado.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**LINE OF CREDIT.** This Agreement evidences a revolving line of credit. Advances under this Agreement may be requested either orally or in writing by Borrower or as provided in this paragraph. All oral requests shall be confirmed in writing on the day of the request, on forms acceptable to Lender. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Karen L. Tollefson, President of The Urban Farmer Inc. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Agreement at any time may be evidenced by endorsements on this Agreement or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Agreement if: (A) Borrower or any guarantor is in default under the terms of this Agreement or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Agreement; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Agreement or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Agreement for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**CROSS COLLATERALIZATION.** This note is cross collateralized with loan #200117780.

**PRIOR NOTE.** Original Promissory Note in the amount of $2,500,000.00 dated August 25, 2009.

**SUCCESSORS AND ASSIGNS.** Subject to any limitations stated in this Agreement on transfer of Borrower's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Borrower, Lender, without notice to Borrower, may deal with Borrower's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Borrower from the obligations of this Agreement or liability under the Indebtedness.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Citywide Banks Operations Center PO Box 128 Aurora, CO 80040-0128.

**MISCELLANEOUS PROVISIONS.** If any part of this Agreement cannot be enforced, this fact will not affect the rest of the Agreement. Lender may delay or forgo enforcing any of its rights or remedies under this Agreement without losing them. Each Borrower understands and agrees that, with or without notice to Borrower, Lender may with respect to any other Borrower (a) make one or more additional secured or unsecured loans or otherwise extend additional credit; (b) alter, compromise, renew, extend, accelerate, or otherwise change the one or more times the time for payment or other terms of any Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; (c) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral; (d) apply such security and direct the order or manner of sale thereof, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine; (e) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; and (f) determine how, when and what application of payments and credits shall be made on any other Indebtedness owing by such other Borrower. Borrower and any other person who signs, guarantees or endorses this Agreement, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Agreement, and unless otherwise expressly stated in writing, no party who signs this Agreement, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Agreement are joint and several.

**PRIOR TO SIGNING THIS AGREEMENT, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. EACH BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**BORROWER:**

**THE URBAN FARMER INC.**

By: _____
    Karen L. Tollefson, President of The Urban Farmer Inc.

X _____
    Karen L. Tollefson, Individually

**LENDER:**

**CITYWIDE BANKS**

X _____
    Authorized Officer

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,300,000.00 | 12-15-2012 | 06-15-2013 | 200117772 | 4A / 45 | UAA0189 | MCH | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** The Urban Farmer Inc.
Karen L. Tollefson
3431 E. 86th Avenue
Thornton, CO 80229-5200

**Lender:** Citywide Banks
PO Box 128
Aurora, CO 80040-0128
(303) 365-3600

**Grantor:** The Urban Farmer Inc.
3431 E. 86th Avenue
Thornton, CO 80229-5200

THIS COMMERCIAL SECURITY AGREEMENT dated December 15, 2012, is made and executed among The Urban Farmer Inc. ("Grantor"); The Urban Farmer Inc. and Karen L. Tollefson ("Borrower"); and Citywide Banks ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All Inventory, Accounts, Equipment, Instruments and General Intangibles

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**BORROWER'S WAIVERS AND RESPONSIBILITIES.** Except as otherwise required under this Agreement or by applicable law, (A) Borrower agrees that Lender need not tell Borrower about any action or inaction Lender takes in connection with this Agreement; (B) Borrower assumes the responsibility for being and keeping informed about the Collateral; and (C) Borrower waives any defenses that may arise because of any action or inaction of Lender, including without limitation any failure of Lender to realize upon the Collateral or any delay by Lender in realizing upon the Collateral; and Borrower agrees to remain liable under the Note no matter what action Lender takes or fails to take under this Agreement.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that: (A) this Agreement is executed at Borrower's request and not at the request of Lender; (B) Grantor has the full right, power and authority to enter into this Agreement and to pledge the Collateral to Lender; (C) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (D) Lender has made no representation to Grantor about Borrower or Borrower's creditworthiness.

**GRANTOR'S WAIVERS.** Grantor waives all requirements of presentment, protest, demand, and notice of dishonor or non-payment to Borrower or Grantor, or any other party to the Indebtedness or the Collateral. Lender may do any of the following with respect to any obligation of any Borrower, without first obtaining the consent of Grantor: (A) grant any extension of time for any payment, (B) grant any renewal, (C) permit any modification of payment terms or other terms, or (D) exchange or release any Collateral or other security. No such act or failure to act shall affect Lender's rights against Grantor or the Collateral.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Borrower may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles

outside the State of Colorado, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. If Grantor changes Grantor's name or address, or the name or address of any person granting a security interest under this Agreement changes, Grantor will promptly notify the Lender of such change.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request

by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. Such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default in Favor of Third Parties.** Borrower or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The death of Borrower or Grantor or the dissolution or termination of Borrower's or Grantor's existence as a going business, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or guarantor, endorser, surety, or accommodation party dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's or Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Colorado Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Borrower would be required to pay, immediately due and payable, without notice of any kind to Borrower or Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver. Receiver may be appointed by a court of competent jurisdiction upon ex parte application and without notice, notice being expressly waived.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and

and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's reasonable costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the reasonable costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Colorado without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Colorado.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Agreement shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Grantor signing below is responsible for all obligations in this Agreement. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means The Urban Farmer Inc. and Karen L. Tollefson and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means The Urban Farmer Inc..

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other Indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Citywide Banks, its successors and assigns.

**Note.** The word "Note" means Original Promissory Note in the amount of $2,500,000.00 dated August 25, 2009.

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

BORROWER AND GRANTOR HAVE READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREE TO ITS TERMS. THIS AGREEMENT IS DATED DECEMBER 15, 2012.

**GRANTOR:**

**THE URBAN FARMER INC.**

By: _____
    Karen L. Tollefson, President of The Urban Farmer
    Inc.

**BORROWER:**

**THE URBAN FARMER INC.**

By: _____
    Karen L. Tollefson, President of The Urban Farmer
    Inc.

X _____
    Karen L. Tollefson, Individually

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,300,000.00 | 12-15-2012 | 06-15-2013 | 200117772 | 4A / 45 | UAA0189 | MCH | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** The Urban Farmer Inc.
Karen L. Tollefson
3431 E. 86th Avenue
Thornton, CO 80229-5200

**Lender:** Citywide Banks
PO Box 128
Aurora, CO 80040-0128
(303) 365-3600

**Grantor:** DKR Land Development Enterprises, LLC, a Colorado limited liability company
7912 Orion Way
Arvada, CO 80007-7876

THIS COMMERCIAL SECURITY AGREEMENT dated December 15, 2012, is made and executed among DKR Land Development Enterprises, LLC, a Colorado limited liability company ("Grantor"); The Urban Farmer Inc. and Karen L. Tollefson ("Borrower"); and Citywide Banks ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All Fixtures

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

Some or all of the Collateral may be located on the following described real estate:

Lot 3, Block 1, Newcastle Subdivision, County of Adams, State of Colorado

**BORROWER'S WAIVERS AND RESPONSIBILITIES.** Except as otherwise required under this Agreement or by applicable law, (A) Borrower agrees that Lender need not tell Borrower about any action or inaction Lender takes in connection with this Agreement; (B) Borrower assumes the responsibility for being and keeping informed about the Collateral; and (C) Borrower waives any defenses that may arise because of any action or inaction of Lender, including without limitation any failure of Lender to realize upon the Collateral or any delay by Lender in realizing upon the Collateral; and Borrower agrees to remain liable under the Note no matter what action Lender takes or fails to take under this Agreement.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that: (A) this Agreement is executed at Borrower's request and not at the request of Lender; (B) Grantor has the full right, power and authority to enter into this Agreement and to pledge the Collateral to Lender; (C) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (D) Lender has made no representation to Grantor about Borrower or Borrower's creditworthiness.

**GRANTOR'S WAIVERS.** Grantor waives all requirements of presentment, protest, demand, and notice of dishonor or non-payment to Borrower or Grantor, or any other party to the Indebtedness or the Collateral. Lender may do any of the following with respect to any obligation of any Borrower, without first obtaining the consent of Grantor: (A) grant any extension of time for any payment, (B) grant any renewal, (C) permit any modification of payment terms or other terms, or (D) exchange or release any Collateral or other security. No such act or failure to act shall affect Lender's rights against Grantor or the Collateral.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Borrower may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management or in the members or managers of the limited liability company Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its membership agreement does not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as

otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. If Grantor changes Grantor's name or address, or the name or address of any person granting a security interest under this Agreement changes, Grantor will promptly notify the Lender of such change.

**GRANTOR'S RIGHT TO POSSESSION.** Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default in Favor of Third Parties.** Borrower or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The death of Borrower or Grantor or the dissolution or termination of Borrower's or Grantor's existence as a going business, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or guarantor, endorser, surety, or accommodation party dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's or Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Colorado Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Borrower would be required to pay, immediately due and payable, without notice of any kind to Borrower or Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver. Receiver may be appointed by a court of competent jurisdiction upon ex parte application and without notice, notice being expressly waived.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's reasonable costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay

**COMMERCIAL SECURITY AGREEMENT**
Loan No: 200117772                        (Continued)                        Page 4

someone else to help enforce this Agreement, and Grantor shall pay the reasonable costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Colorado without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Colorado.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Agreement shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Grantor signing below is responsible for all obligations in this Agreement. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means The Urban Farmer Inc. and Karen L. Tollefson and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means DKR Land Development Enterprises, LLC, a Colorado limited liability company .

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Citywide Banks, its successors and assigns.

**Note.** The word "Note" means Original Promissory Note in the amount of $2,500,000.00 dated August 25, 2009.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**BORROWER AND GRANTOR HAVE READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREE TO ITS TERMS. THIS AGREEMENT IS DATED DECEMBER 15, 2012.**

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

Loan No: 200117772                                                        Page 5

GRANTOR:

**DKR LAND DEVELOPMENT ENTERPRISES, LLC, A COLORADO LIMITED LIABILITY COMPANY**

By: _____
    Karen  L.  Tollefson,  Manager  of  DKR  Land
    Development  Enterprises,  LLC,  a  Colorado  limited
    liability company

BORROWER:

**THE URBAN FARMER INC.**

By: _____
    Karen  L.  Tollefson,  President  of  The  Urban  Farmer
    Inc.

X _____
    Karen L. Tollefson, Individually

**Schedule 2**

| Job Id. | BONDED JOB | Contract | Pending C/O | Total Contract | Billed to Date | Remaining | Outstanding Balance | Obligee |
|---|---|---|---|---|---|---|---|---|
| 3100466T | BURLINGAME RANCH PH II | 569,448 | (6,069) | 563,379 | 38,842 | 524,537 | - | Haselden |
| 3100471T | CCD - S. CLASSROOM BLDG | 112,802 | | 112,802 | 14,918 | 97,884 | 13,426 | Phipps |
| 3100451T | CCD-STUDENT LEARNING CTR | 257,384 | | 257,384 | 196,005 | 61,379 | 143,913 ** | Phipps |
| 3100467TC | CHERRY PIE PRK-FILING 35 | 104,385 | 13,209 | 117,594 | 89,355 | 28,239 | 8,385 | Mortenson |
| 3100420TC | DMNS-ECF ADDITION | 68,212 | | 68,212 | 15,120 | 53,092 | - | Phipps |
| 3100474T | FOOTHILLS JS36 INTRCHNGE | 968,128 | 10,800 | 978,928 | 797,793 | 181,135 | 39,000 * | Boulder |
| 3100490TC | I-70B WIDEN @ GRAND JCT | 141,397 | | 141,397 | 16,579 | 124,818 | - | Lawson |
| 3100470 | PAULING PROPERTIES | 740,183 | | 740,183 | 19,717 | 720,466 | | Bryan |
| 3100440T | PHILLIP DORCAS JENSEN PK | 312,612 | | 312,612 | 312,612 | - | 21,344 | Norris |
| 3100491T | RED-TAILED HAWK PARK DRA | 43,409 | | 43,409 | 42,045 | 1,364 | - | Arvada |
| 3100406TC | SAINT JOSEPH HERITAGE | 825,533 | | 825,533 | 728,821 | 96,712 | 361 | Mortenson |
| 3100485T | SDS WATER TREATMENT PLAN | 786,852 | | 786,852 | 10,612 | 776,240 | 10,612 | McCarthy |
| 3100422T | TCH-THE CHILDRENS HOSPTL | 337,625 | | 337,625 | 336,090 | 1,535 | 38,612 ** | Phipps |

\* City of Boulder issuing a joint check to DBC for the amount of their claim.

** The A/P and Outstanding Balance need to be reconciled as the GC paid for material that we were also billed for

| 3100484T | Lyons School - Terminated 7-10-2013 | | | | | | | St. Vrain |
| | Sunrise | Completed - In Claim | | | | | | Arvada |
| | Wolff | Completed - In Claim | | | | | | Arvada |

NON BONDED COMMON OBLIGEE

| 31000496T | Cherry Pie Park Repair | | | | | | | Mortenson |
| 3100436T | CSU Engineering II | | | | | | | Haselden |
| 32100494T | NREL Small Project | | | | | | | Haselden |

**Schedule 3**

ROLLER & ASSOCIATES, INC. Auctioneers - Liquidators - Appraisers

LIQUIDATION VALUE APPRAISAL FOR:

Urban Farmer, Inc.

Date of Appraisal: July 3rd, 2012

| UNIT# | YEAR | EQUIPMENT DESCRIPTION | MFG | MODEL | SER # | LIQUIDATION VALUE TOTAL |
|---|---|---|---|---|---|---|
| | 1994 | 24' TANDEM AXLE STEEL EQUIPMENT TRAILER W/ MESH DECK & LOCKING STORAGE BOX | HOME MADE | UTIL | ID100X989CO | 1,500.00 |
| ET3 | 1988 | 14' TANDEM AXLE FLATBED EQUIPMENT TRAILER | JACOBS | UTIL | IJ9FS142XI033178 | 1,000.00 |
| ET8 | 1991 | 15' TANDEM AXLE FLATBED EQUIPMENT TRAILER | SUPERIOR | UTIL | 1S9HP1621MC241851 | 750.00 |
| ET9 | 1979 | 24' TANDEM AXLE FLATBED EQUIPMENT TRAILER | SUPERIOR | UTIL | 3305 | 500.00 |
| ET10 | 1987 | 7'X16' TANDEM AXLE STEEL EQUIPMENT TRAILER W/ MESH DECK & LOCKING STORAGE BOX | HOME MADE | UTIL | ID1123252CO | 1,000.00 |
| ET13 | 1995 | 7'X16" TANDEM AXLE STEEL EQUIPMENT TRAILER W/ MESH DECK & LOCKING STORAGE BOX | SPORT TRAIL | 1995 | 1T9UF16255B399052 | 1,000.00 |
| ET14 | 1995 | 24' TANDEM AXLE STEEL EQUIPMENT TRAILER W/ MESH DECK & LOCKING STORAGE BOX | SPORT TRAIL | UTIL | 1T9UF16275B399053 | 1,000.00 |
| ET16 | 1996 | 24' TANDEM AXLE STEEL EQUIPMENT TRAILER W/ MESH DECK & LOCKING STORAGE BOX | HOME MADE | UTIL | ID10020555CO | 1,000.00 |
| ET17 | 1971 | 40' TANDEM AXLE DRY VAN STORAGE TRAILER | TIMPTE | SEMI | 21093 | 1,300.00 |
| | NF | 40' TANDEM AXLE DRY VAN STORAGE TRAILER | BROWN | 40' VAN | M602382 | 1,300.00 |
| | NF | 40' TANDEM AXLE DRY VAN STORAGE TRAILER | PRUEHAUF | 40' VAN | AV327036 | 1,300.00 |
| ET20 | 1966 | 40' TANDEM AXLE DRY VAN STORAGE TRAILER | PINES | UT2 | 1420Z | 1,300.00 |
| ET23 | 1997 | 24' TANDEM AXLE STEEL EQUIPMENT TRAILER W/ MESH DECK & LOCKING STORAGE BOX | SUPERIOR | UTIL | 1SPAP1628UC241279 | 1,500.00 |
| ET24 | 1997 | 16' TANDEM AXLE FLATBED EQUIPMENT TRAILER | UTILITY | UT2 | 4ASUS1623VS009282 | 750.00 |

ROLLER & ASSOCIATES, INC. Auctioneers - Liquidators - Appraisers

LIQUIDATION VALUE APPRAISAL FOR:
Urban Farmer, Inc.

Date of Appraisal:
July 3rd, 2012

| UNIT# | YEAR | EQUIPMENT DESCRIPTION | MFG | MODEL | SER # | LIQUIDATION VALUE TOTAL |
|---|---|---|---|---|---|---|
| ET25 | 1998 | 24' TANDEM AXLE STEEL EQUIPMENT TRAILER W/ MESH DECK & LOCKING STORAGE BOX | SPORT TRAIL | UTI | 5APCH1622WL000910 | 1,000.00 |
| ET26 | 1998 | 24' TANDEM AXLE STEEL EQUIPMENT TRAILER W/ MESH DECK & LOCKING STORAGE BOX | SPORT TRAIL | UTI | 5APCH1625WL001095 | 1,000.00 |
| ET30 | 1999 | 45' TRIPLE AXLE DROP DECK 25 TON CAPACITY LOWBOY TRAILER W/ WINCH | TRAIL KING | TK70HT | 1TKA04824XM047884 | 20,000.00 |
| ET32 | 2000 | 7'X16' TANDEM AXLE STEEL EQUIPMENT TRAILER W/ MESH DECK & LOCKING STORAGE BOX | SPORT TRAIL | 2302 | 5APCH1625YL000306 | 1,500.00 |
| ET33 | 2000 | 7X18 TANDEM AXLE LANDSCAPE TRAILER W/ LOCKING BOXES & MESH RAMP | SPORT TRAIL | 2275 | 5APSK1827YL000186 | 1,500.00 |
| ET34 | 2000 | 7X16 TANDEM AXLE LANDSCAPE TRAILER W/ LOCKING BOXES & MESH RAMP | SPORT TRAIL | NF | 5APCH1625XL000307 | 1,500.00 |
| ET35 | 2000 | 8.5X16 TANDEM AXLE FLATBED EQUIPMENT TRAILER | NF | TRL | 1H9F06C2SYB350040 | 1,000.00 |
| ET36 | 2000 | 48' TANDEM AXLE FLATBED TRAILER | AZTEC | NF | 1A9BR1B37YM362430 | 5,500.00 |
| ET37 | 1985 | 28' TANDEM AXLE  SITE STORAGE TRAILER | NF | NF | 1TA112814F1118191 | 1,000.00 |
| ET38 | 1983 | 28' TANDEM AXLE  SITE STORAGE TRAILER | NF | 1983 | 1BK10VU16DE206345 | 1,000.00 |
| ET40 | 2001 | 7X16X7 TANDEM AXLE  LANDSCAPE TRAILER | TEMCO | 7000 G | 17106P3501030134 | 1,000.00 |
| ET41 | 2001 | 7X16X7 TANDEM AXLE  LANDSCAPE TRAILER | TEMCO | 7000 G | 17016P35010301345 | 1,000.00 |
| ET43 | 2002 | 16' TANDEM AXLE FLATBED EQUIPMENT TRAILER | TEMCO | FB16D | 17016P52020302242 | 1,000.00 |
| ET44 | 2002 | 7X16X7 TANDEM AXLE  LANDSCAPE TRAILER | TEMCO | 7x16x7 | 17016P35020402316 | 1,000.00 |
| ET45 | 2002 | 7X16X7 TANDEM AXLE  LANDSCAPE TRAILER | TEMCO | 7x16x7 | 17016P35020402314 | 1,000.00 |

ROLLER & ASSOCIATES, INC. Auctioneers - Liquidators - Appraisers

LIQUIDATION VALUE APPRAISAL FOR:

Urban Farmer, Inc.

Date of Appraisal:
July 3rd, 2012

| UNIT# | YEAR | EQUIPMENT DESCRIPTION | MFG | MODEL | SER # | LIQUIDATION VALUE TOTAL |
|---|---|---|---|---|---|---|
| ET46 | 2002 | 7X16X7 TANDEM AXLE LANDSCAPE TRAILER | TEMCO | 7x16x7 | 17016P35020402317 | 1,000.00 |
| ET47 | 2002 | 7X16X7 TANDEM AXLE LANDSCAPE TRAILER | TEMCO | 7x16x7 | 17016P35020402315 | 1,000.00 |
| ET50 | 2003 | 7X16X7 TANDEM AXLE LANDSCAPE TRAILER | TEMCO | 7x16x7 | IT9P361683M737241 | 1,000.00 |
| ET51 | 2003 | 18' TANDEM AXLE FLATBED EQUIPMENT TRAILER | TEMCO | 18FT | 1T9P3616X3M737242 | 1,000.00 |
| ET52 | 2004 | 14' TANDEM AXLE DUMP TRAILER W/ STEEL SIDES | BRI-MAR | 0DT614 | 43YDC14264C026405 | 4,000.00 |
| ET53 | 2005 | 32' TANDEM AXLE GOOSENECK FLATBED EQUIPMENT TRAILER W/ STEEL RAMPS | NF | | 1E9BF322255230254 | 5,000.00 |
| ET54 | 1974 | 40' TANDEM AXLE DRY VAN STORAGE TRAILER | FRUEHAUF | BOX | HPR488364 | 1,500.00 |
| ET55 | 2006 | TANDEM AXLE FLATBED GOOSENECK EQUIPMENT TRAILER | DIAMOND T | NULL | 5FWFP30276R008828 | 6,500.00 |
| ET56 | 2006 | 16' TANDEM AXLE FLATBED EQUIPMENT TRAILER | TEMCO | FLATBED | 1T9P3616X6M737343 | 1,500.00 |
| ET57 | 2006 | 7X16 TANDEM AXLE LANDSCAPE TRAILER W/ LOCKING BOXES & MESH RAMP | TEMCO | FLATBED | 1T9P361616M737344 | 1,500.00 |
| ET58 | 2006 | 16' TANDEM AXLE FLATBED EQUIPMENT TRAILER | TEMCO | FLATBED | 1T9P361626M737384 | 1,500.00 |
| ET59 | 2006 | 16' TANDEM AXLE FLATBED EQUIPMENT TRAILER | TEMCO | FLATBED | 1T9P361606M737383 | 1,500.00 |
| ET60 | 2005 | '05 ROADSTER BOXTRL#3003 | ROADSTER | 816C | 1D9ES1624CD453003 | 3,500.00 |
| ET61 | 1998 | 185 CFM TOW BEHIND AIR COMPRESSOR | INGERSOLL RAND | P185 | 293513U1221 | 3,500.00 |
| ET62 | 2007 | 7'X16' TANDEM AXLE DUMP TRAILER | UNK | 83"X16 | 42EDT142X71038538 | 5,500.00 |
| ET63 | 1979 | 45' TANDEM AXLE DROP DECK EQUIPMENT TRAILER | FRUEHAUF | DRP DK | WZ329601 (do not renew | 2,500.00 |
| ET65 | | TOWABLE AIR COMPRESSOR | ATLAS COPCO | | | 4,000.00 |
| ET67 | | 14' T/A EQUIPMENT TRAILER | BIG TEX | | | 3,000.00 |

Page 3 of 9

ROLLER & ASSOCIATES, INC. Auctioneers - Liquidators - Appraisers

LIQUIDATION VALUE APPRAISAL FOR:

Urban Farmer, Inc.

Date of Appraisal: July 3rd, 2012

| UNIT# | YEAR | EQUIPMENT DESCRIPTION | MFG | MODEL | SER # | LIQUIDATION VALUE TOTAL |
|-------|------|------------------------|-----|-------|-------|--------------------------|
| | 1999 | 3/4 TON PICKUP TRUCK, 214,711 MILES | FORD | F250 | 1FTNF20S7XEE47838 | 1,380.00 |
| EV49 | 1997 | 1/2 TON PICKUP TRUCK, 230,391 MILES | FORD | F150 | 1FTDF1724VKB88126 | 1,200.00 |
| EV51 | 1999 | 3/4 TON PICKUP TRUCK, SUPER DUTY, 148,340 MILES | FORD | F250 | 1FTNX21L2XEA72109 | 1,750.00 |
| EV52 | 1999 | 3/4 TON PICKUP TRUCK, SUPER DUTY, 138,214 MILES | FORD | F250 | 1FTNX21L9XEA72110 | 1,750.00 |
| EV53 | 1999 | 3/4 TON PICKUP TRUCK, SUPER DUTY, 201,214 MILES | FORD | F250 | 1FTNX20L3XEA77787 | 1,750.00 |
| EV54 | 1999 | 1 TON PICKUP TRUCK, 178,077 MILES | FORD | F350 | 1FDSF358SXEA72107 | 1,750.00 |
| EV56 | 1999 | 3/4 TON EXTENDED CAB PICKUP TRUCK, SUPER DUTY, SNOW PLOW FRAME, LADDER RACK, 101,233 MILES | FORD | F250SD | 1FTNX21L0XEA72108 | 1,750.00 |
| EV57 | 1999 | 3/4 TON PICKUP TRUCK, SUPER DUTY, 148,421 MILES | FORD | F250 | 1FTNX21LOXEA72111 | 1,750.00 |
| EV59 | 1999 | 3/4 TON PICKUP TRUCK, SUPER DUTY, MILEAGE NOT AVAILABLE | FORD | F250 | 1FTNX21L2XEB18909 | 1,750.00 |
| EV60 | 1999 | 3/4 TON EXTENDED CAB PICKUP TRUCK, SUPER DUTY, MILEAGE NOT AVAILABLE | FORD | F250 | 1FTNX21S6XEB28745 | 1,750.00 |
| EV61 | 1999 | 3/4 TON EXTENDED CAB PICKUP TRUCK, MILEAGE NOT AVAILABLE | FORD | F250 | 1FTNX20L7XED18377 | 1,750.00 |
| EV62 | 1999 | 3/4 TON EXTENDED CAB PICKUP TRUCK, MILEAGE NOT AVAILABLE | FORD | F250 | 1FTNX20LOXEC38497 | 1,750.00 |
| EV63 | 1999 | 3/4 TON EXTENDED CAB PICKUP TRUCK, MILEAGE NOT AVAILABLE | FORD | F250 | 1FTNF21L7XEC45917 | 1,750.00 |
| EV64 | 1999 | 3/4 TON EXTENDED CAB PICKUP TRUCK, MILEAGE NOT AVAILABLE | FORD | F250 | 1FTNX21LOXED88186 | 1,750.00 |
| EV65 | 1999 | 3/4 TON EXTENDED CAB PICKUP TRUCK, MILEAGE NOT AVAILABLE | FORD | F250 | 1FTNX21L5XEE36507 | 1,750.00 |
| EV66 | 1999 | 3/4 TON EXTENDED CAB PICKUP TRUCK, MILEAGE NOT AVAILABLE | FORD | F250 | 1FTNX21L3XEE40488 | 1,750.00 |

ROLLER & ASSOCIATES, INC. Auctioneers - Liquidators - Appraisers

LIQUIDATION VALUE APPRAISAL FOR:
Urban Farmer, Inc.

Date of Appraisal:
July 3rd, 2012

| UNIT# | YEAR | EQUIPMENT DESCRIPTION | MFG | MODEL | SER # | LIQUIDATION VALUE TOTAL |
|---|---|---|---|---|---|---|
| EV67 | 1999 | 1 TON EXTENDED CAB PICKUP TRUCK, MILEAGE NOT AVAILABLE | FORD | F350 | 1FTSF31SOXED52694 | 1,750.00 |
| EV69 | 1999 | 3/4 TON EXTENDED CAB PICKUP TRUCK, MILEAGE NOT AVAILABLE | FORD | F250 | 1FTNF21LOXEE44727 | 1,750.00 |
| EV73 | 1999 | 1/2 TON PICKUP TRUCK, 204,159 MILES | FORD | F150 | 1FTZF1726XKB67271 | 1,400.00 |
| EV74 | 1993 | TRUCK TRACTOR, 264,364 MILES | FORD | LTA900 | 1FDYY95R2PVA04101 | 5,500.00 |
| EV75 | 2000 | 3/4 TON 4X4 PICKUP TRUCK, 107,843 MILES | FORD | F250 | 1FTNX21L8YEB79991 | 2,000.00 |
| EV77 | 2000 | 3/4 TON 4X4 PICKUP TRUCK, 154,795 MILES | FORD | F250 | 1FTNF21L6YEB79989 | 2,000.00 |
| EV78 | 2000 | 3/4 TON PICKUP TRUCK, 130,863 MILES | FORD | F250 | 1FTNX20L2YEB95590 | 2,000.00 |
| EV79 | 2000 | 1/2 TON PICKUP TRUCK, 151,596 MILES | FORD | F150 | 1FTZF1725YNB51563 | 2,000.00 |
| EV81 | 2000 | 1/2 TON PICKUP TRUCK, 154,192 MILES | FORD | F150 | 1FTZF1728YKA85818 | 2,000.00 |
| EV82 | 2000 | 1/2 TON PICKUP TRUCK, 136,395MILES | FORD | F150 | 1FTZF1729YNB40291 | 2,000.00 |
| EV85 | 2000 | 1/2 TON PICKUP TRUCK, 153,420 MILES | FORD | F150 | 1FTZF2839YNC21413 | 2,000.00 |
| EV92 | 2001 | 3/4 TON PICKUP TRUCK, 93,488 MILES | FORD | F250 | 1FTNX20L01EB58396 | 2,500.00 |
| EV93 | 2001 | 3/4 TON EXTENDED CAB PICKUP TRUCK, 87,468 MILES | FORD | F250 | 1FTNX20L41EC24657 | 2,500.00 |
| EV94 | 2001 | 3/4 TON PICKUP TRUCK, 100,992 MILES | FORD | F250 | 3FTNX20L51MA39270 | 2,500.00 |
| EV99 | 2002 | 3/4 TON EXTENDED CAB PICKUP TRUCK, 126,775 MILES, SNOW PLOW FRAME, 126,581 M MILES | FORD | F250SD | 1FTNX21L12EA84972 | 2,500.00 |
| EV100 | 2002 | 3/4 TON PICKUP TRUCK, SUPER DUTY, 97,349 MILES | FORD | F250 | 1FTNX21L42EA96615 | 2,500.00 |
| EV101 | 2002 | 3/4 TON 4X4 EXTENDED CAB PICKUP TRUCK, 105,785 MILES | FORD | F250 | 1FTNX21L02EC10142 | 3,000.00 |
| EV102 | 2002 | 3/4 TON EXTENDED CAB PICKUP TRUCK, 107,336 MILES | FORD | F250 | 1FTNX2OL32EC18270 | 3,000.00 |

ROLLER & ASSOCIATES, INC. Auctioneers - Liquidators - Appraisers

LIQUIDATION VALUE APPRAISAL FOR:
Urban Farmer, Inc.

Date of Appraisal:
July 3rd, 2012

| UNIT# | YEAR | EQUIPMENT DESCRIPTION | MFG | MODEL | SER # | LIQUIDATION VALUE TOTAL |
|---|---|---|---|---|---|---|
| EV103 | 2002 | 3/4 TON 4X4 EXTENDED CAB PICKUP TRUCK, 91,555 MILES | FORD | F250 | 1FTNX21L62EC10159 | 3,000.00 |
| EV104 | 2002 | 3/4 TON EXTENDED CAB PICKUP TRUCK, 79,478 MILES | FORD | F250 | 1FTNX20L02EC18260 | 3,000.00 |
| EV105 | 2002 | 3/4 TON 4X4 EXTENDED CAB PICKUP TRUCK, 81,618 MILES | FORD | F250 | 1FTNX21L32EC10149 | 3,000.00 |
| EV106 | 2001 | 1 TON PICKUP TRUCK, 96,745 MILES | FORD | F350 | 1FDWF37S11EB93843 | 2,250.00 |
| EV107 | 2002 | 1/2 TON PICKUP TRUCK, 144, 028 MILES | FORD | F150 | 1FTRF17292NB01658 | 2,000.00 |
| EV108 | 2002 | 1/2 TON PICKUP TRUCK, 135,087 MILES | FORD | F150 | 1FTRF172X2NB01653 | 2,000.00 |
| EV109 | 2002 | 3/4 TON PICKUP TRUCK, 94,843 MILES | FORD | F250 | 1FTNX20L02EC41988 | 2,500.00 |
| EV110 | 2002 | 3/4 TON 4X4 PICKUP TRUCK 89,402 MILES | FORD | F250 | 1FTNX21L32EC26867 | 2,500.00 |
| EV112 | 2002 | 1/2 TON PICKUP TRUCK 119,597 MILES, TOOL BOXES | FORD | F150XL | 1FTRF17282NB56733 | 2,250.00 |
| EV113 | 2000 | 1/2 TON PICKUP TRUCK 135,214 MILES, TOOL BOXES | FORD | F150XL | 1FTRF172X2NB57317 | 2,000.00 |
| EV115 | 2002 | 1/2 TON PICKUP TRUCK 119,264 MILES, TOOL BOXES, SNOW PLOW FRAME, LADDER RACK | FORD | F150 | 1FTRF17242NB87431 | 2,250.00 |
| EV116 | 2002 | 1/2 TON PICKUP TRUCK 98,993 MILES | FORD | F150 | 1FTRF17232NB98016 | 2,000.00 |
| EV117 | 2002 | 3/4 TON PICKUP TRUCK, 106,253 MILES | FORD | F250 | 1FDNF21L02ED28805 | 2,500.00 |
| EV118 | 1997 | SINGLE AXLE 5-7 YD. DUMP TRUCK, 180,458 MILES | INTERNATIONAL | 4700 | 1HTSCAAL8VH473218 | 11,000.00 |
| EV119 | 1997 | SINGLE AXLE 5-7 YD. DUMP TRUCK, 175,431 MILES | INTERNATIONAL | 4700 | 1HTSCAAL2VH473215 | 11,000.00 |
| EV120 | 1997 | 3,000 GALLON CAPACITY SINGLE AXLE WATER TRUCK, 188,567 MILES | INTERNATIONAL | 4700 | 1HTSCAAL3VH473210 | 14,000.00 |
| EV121 | 1997 | 3,000 GALLON CAPACITY SINGLE AXLE WATER TRUCK, 181,495 MILES | INTERNATIONAL | 4700 | 1HTSCAAL4VH473216 | 14,000.00 |

ROLLER & ASSOCIATES, INC. Auctioneers - Liquidators - Appraisers

LIQUIDATION VALUE APPRAISAL FOR:
Urban Farmer, Inc.

Date of Appraisal:
July 3rd, 2012

| UNIT# | YEAR | EQUIPMENT DESCRIPTION | MFG | MODEL | SER # | LIQUIDATION VALUE TOTAL |
|---|---|---|---|---|---|---|
| EV122 | 2003 | 3/4 TON PICKUP TRUCK, 93,333 MILES, LADDER RACK, CROSS BED TOOL BOX, 100 GALLON FUEL TANK W/ PUMP | FORD | F250 | 3FTNF20LX3MB19203 | 3,000.00 |
| EV123 | 2003 | 3/4 TON PICKUP TRUCK, 111,290 MILES | FORD | F250 | 3FTNF20L53MB19206 | 3,000.00 |
| EV126 | 2003 | 3/4 TON 4X4 PICKUP TRUCK, SUPER DUTY, 140,061 MILES | FORD | F250 | 3FTNF21L03MB30760 | 3,000.00 |
| EV127 | 2003 | 3/4 TON PICKUP TRUCK, MILEAGE NOT AVAILABLE, LADDER RACK, CROSS BED TOOL BOX, 100 GALLON FUEL TANK & PUMP | FORD | F250 | 3FTNF21L23MB30758 | 3,000.00 |
| EV128 | 2003 | 3/4 TON PICKUP TRUCK, MILEAGE NOT AVAILABLE | FORD | F250 | 3FTNX21L43MB37126 | 3,000.00 |
| EV129 | 2003 | 3/4 TON 4X4 PICKUP TRUCK, MILEAGE NOT AVAILABLE | FORD | F250 | 3FTNX21L23MB37092 | 3,000.00 |
| EV130 | 2003 | 3/4 TON  PICKUP TRUCK, MILEAGE NOT AVAILABLE | FORD | F250 | 3FTNX20L03MB30868 | 3,000.00 |
| EV131 | 2003 | 1/2 TON PICKUP TRUCK, MILEAGE NOT AVAILABLE | FORD | F150 | 1FTRF17253NB30771 | 2,750.00 |
| EV133 | 2004 | 1/2 TON PICKUP TRUCK, MILEAGE NOT AVAILABLE | FORD | F150 | 2FTRX18W34CA65179 | 3,000.00 |
| EV135 | 2004 | 3/4 TON PICKUP TRUCK, MILEAGE NOT AVAILABLE | FORD | F250 | 1FTNF21L84EC68246 | 3,500.00 |
| EV136 | 2004 | 3/4 TON PICKUP TRUCK, MILEAGE NOT AVAILABLE | FORD | F250 | 1FTNF21LO4EC68256 | 3,500.00 |
| EV137 | 2004 | 3/4 TON PICKUP TRUCK, SUPER DUTY, 79,733 MILES | FORD | F250 | 1FTNF21L74EC68285 | 3,500.00 |
| EV138 | 2004 | 1/2 TON PICKUP TRUCK, SUPER DUTY, 122,053 MILES | FORD | F250 | 1FTNF21L14EC68296 | 3,500.00 |
| EV139 | 2004 | 3/4 TON PICKUP TRUCK, SUPER DUTY, 71,193 MILES | FORD | F250 | 1FTNF21LO4EC68306 | 3,500.00 |
| EV140 | 2004 | 1/2 TON PICKUP TRUCK 85,349 MILES | FORD | F150 | 2FTRF17214CA31873 | 3,000.00 |
| EV141 | 2005 | 4 DOOR 4X4 SPORT UTILITY VEHICLE, 83,780 MILES | FORD | ESCAPE | 1FMYU02725KD84311 | 5,500.00 |

Page 7 of 9

ROLLER & ASSOCIATES, INC. Auctioneers - Liquidators - Appraisers

LIQUIDATION VALUE APPRAISAL FOR:
Urban Farmer, Inc.

Date of Appraisal:
July 3rd, 2012

| UNIT# | YEAR | EQUIPMENT DESCRIPTION | MFG | MODEL | SER # | LIQUIDATION VALUE TOTAL |
|---|---|---|---|---|---|---|
| EV142 | 2005 | 4 DOOR 4X4 SPORT UTILITY VEHICLE, 78,635 MILES | FORD | ESCAPE | 1FMYU02X5KD98179 | 5,500.00 |
| EV143 | 2005 | 4 DOOR 4X4 SPORT UTILITY VEHICLE, 80,318 MILES | FORD | ESCAPE | 1FMYU02Z55KE07581 | 5,500.00 |
| EV144 | 2005 | 4 DOOR 4X4 SPORT UTILITY VEHICLE, 91,411 MILES | FORD | ESCAPE | 1FMYUO2Z25KE15475 | 5,500.00 |
| EV145 | 2005 | 4 DOOR 4X4 SPORT UTILITY VEHICLE, 78,839 MILES | FORD | ESCAPE | 1FMYU02Z45KE15476 | 5,500.00 |
| EV146 | 2005 | 4 DOOR 4X4 SPORT UTILITY VEHICLE, MILEAGE NOT AVAILABLE | FORD | ESCAPE | 1FMYU02Z05KD15474 | 5,500.00 |
| EV148 | 2005 | 3/4 TON 4X4 PICKUP TRUCK, SUPER DUTY, 100,369 MILES | FORD | F250 | 1FTNF21535EC25582 | 5,750.00 |
| EV149 | 2005 | 3/4 TON 4X4 PICKUP TRUCK, SUPER DUTY, 88,469 MILES | FORD | F250 | 1FTNF21565EB70237 | 5,750.00 |
| EV150 | 2005 | 3/4 TON 4X4 PICKUP TRUCK, SUPER DUTY, 88,515 MILES, TOLL BOXES IN BED, 100 GALLON FUEL TANK & PUMP | FORD | F250 | 1FTNF21SX5EC90154 | 5,750.00 |
| EV152 | 2005 | 3/4 TON 4X4 PICKUP TRUCK, SUPER DUTY, 72,852 MILES, TOOL BOX, SNOW PLOW FRAME | FORD | F250 | 1FTNF21575EC40134 | 5,750.00 |
| EV153 | 2005 | 3/4 TON 4X4 PICKUP TRUCK, SUPER DUTY, 86,185 MILES | FORD | F250 | 1FTNF21545ED23164 | 5,750.00 |
| EV155 | 2006 | 3/4 TON 4X4 PICKUP TRUCK, SUPER DUTY, 74,765 MILES | FORD | F250 | 1FTNF21516EC48134 | 6,250.00 |
| EV156 | 2006 | 3/4 TON 4X4 PICKUP TRUCK, SUPER DUTY, 83,339 MILES | FORD | F250 | 1FTNF21576EC51202 | 6,250.00 |
| | 2006 | 3/4 TON 4X4 PICKUP TRUCK, SUPER DUTY, 77,381 MILES | FORD | F250 | 1FTNF21556EC81041 | 6,250.00 |
| | | | | | **TOTAL LIQUIDATION VALUE: UNENCUMBERED ITEMS** | **$425,100.00** |
| EV162 | 2001 | TRUCK TRACTOR, 685,88 MILES | FREIGHTLINER | FLD120 | 1FUNAHCG71PF97081 | 7,000.00 |
| EV163 | 2005 | TRUCK TRACTOR | INTERNATIONAL | 9900i | 3HSCHAPR45N128683 | 35,000.00 |
| | | | | | | |
| | | | | | | |
| | | **THE FOLLOWING BELOW LISTED ITEMS HAVE LOAN BALANCES** | | | | |
| EV169 | 2010 | 4 DOOR SEDAN | FORD | FUSION | 3EADP0L35AR282620 | 10,000.00 |

Page 8 of 9

ROLLER & ASSOCIATES, INC. Auctioneers - Liquidators - Appraisers

LIQUIDATION VALUE APPRAISAL FOR:

Urban Farmer, Inc.

Date of Appraisal:

July 3rd, 2012

| UNIT# | YEAR | EQUIPMENT DESCRIPTION | MFG | MODEL | SER # | LIQUIDATION VALUE TOTAL |
|-------|------|------------------------|------|--------|--------|--------------------------|
| EV168 | 2009 | PICKUP TRUCK | FORD | F450 | 1FDAF47R09EA51136 | 20,000.00 |
| EV167 | 2009 | PICKUP TRUCK | FORD | F450 | 1FDAF47R09EA94486 | 20,000.00 |
| EV164 | 2009 | SUV | CADILLAC | ESCALADE | 1GYFK43509R164547 | 36,000.00 |
| EV170 | 2010 | PICKUP TRUCK | FORD | F150 | 1FTFX1EV8AKE03035 | 15,000.00 |
| EV171 | 2010 | PICKUP TRUCK | FORD | F150 | 1FTFX1EVXAKE03036 | 15,000.00 |
| EV172 | 2010 | PICKUP TRUCK | FORD | F150 | 1FTFX1EV1AFC16602 | 15,000.00 |
| EV173 | 2010 | PICKUP TRUCK | FORD | F150 | 1FTFX1EV3AFC16603 | 15,000.00 |
| | | | | | | |
| | | **TOTAL LIQUIDATION VALUE - ENCUMBERED ITEMS** | | | | **146,000.00** |
| | | | | | | |
| | | | | | | **$571,100.00** |

Page 9 of 9

**Schedule 4**

## 12-WEEK CASH FLOW PROJECTION

| WEEK ENDING DATES >> | 07/19/13 | 07/26/13 | 08/02/13 | 08/09/13 | 08/16/13 | 08/23/13 | 08/30/13 | 09/06/13 | 09/13/13 | 09/20/13 |
|---|---|---|---|---|---|---|---|---|---|---|
| **INFLOWS / DESCRIPTION** | | | | | | | | | | |
| Weekly Deposit | | | | | | | | | | |
| Other | 80,000 | 150,000 | 125,000 | 150,000 | 175,000 | 175,000 | 200,000 | 125,000 | 150,000 | 175,000 |
| **TOTAL INFLOWS** | 80,000 | 150,000 | 125,000 | 150,000 | 175,000 | 175,000 | 200,000 | 125,000 | 150,000 | 175,000 |
| **OUTFLOWS / DESCRIPTION** | | | | | | | | | | |
| Payroll & related burden | 52,000 | 65,000 | 48,000 | 62,000 | 45,000 | 62,000 | 45,000 | 62,000 | 45,000 | 62,000 |
| Payroll taxes | 23,500 | 15,000 | 20,150 | 13,450 | 19,220 | 12,600 | 21,750 | 15,000 | 21,750 | 15,000 |
| Garnishments and 401k withholdings | 950 | 485 | 950 | 485 | 950 | 485 | 950 | 485 | 950 | 485 |
| Qrtly Payroll Taxes | | 45,000 | | | | | | | | |
| Workman's Comp | 8,150 | | | | 8,150 | | | | 8,150 | |
| Utilities: Verizon, Xcel, Water/Sewer | 4,250 | 100 | 4,250 | 2,600 | 4,750 | 100 | 1,250 | 950 | 2,500 | 4,250 |
| Yard Trash | | 4,000 | | 4,000 | | | | | 4,000 | |
| Rent (bldg) | | 11,000 | | | | | 11,000 | | | |
| Business insurance | | 16,803 | | | | 16,803 | | | | 16,803 |
| Medical/Dental/Other insurance | | 10,640 | 1,100 | | | 10,500 | 140 | 1,100 | | |
| Auto/Equip loans | 2,240 | 3,630 | 5,360 | 1,280 | 3,975 | | 3,630 | 3,290 | 2,825 | 1,155 |
| CW Line of credit interest | | | | | | | | | | |
| CW Loan Pymt/interest | | | | | | | | | | |
| CW Credit Card | | 5,000 | | 5,000 | | 5,000 | | 5,000 | | 5,000 |
| CW Fees | | | 275 | | | | | 275 | | |
| Taxes - Real Estate, Personal Prop. etc. | | | | | | | | | | |
| Fuel | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 |
| DKR Note Interest | | | | | | | | | | |
| A/P Notes | | | | | | | | | | |
| Other - General | | | | | | | | | | |
| **TOTAL OUTFLOWS** | 94,590 | 180,158 | 83,585 | 92,315 | 85,545 | 110,988 | 87,220 | 91,600 | 88,675 | 108,193 |
| **NET CASH POSITION** | (14,590) | (30,158) | 41,415 | 57,685 | 89,455 | 64,012 | 112,780 | 33,400 | 61,325 | 66,807 |
| Supplies/Subs | 34,400 | 64,500 | 53,750 | 64,500 | 75,250 | 75,250 | 86,000 | 53,750 | 64,500 | 75,250 |
| | (48,990) | (94,658) | (12,335) | (6,815) | 14,205 | (11,238) | 26,780 | (20,350) | (3,175) | (8,443) |
| | (112,590) | (207,348) | (219,683) | (226,498) | (212,293) | (223,531) | (196,751) | (217,101) | (220,276) | (228,719) |

*TO BE FUNDED UPON COURT APPROVAL*

| | 09/27/13 | 10/04/13 | 10/11/13 | 10/18/13 | 10/25/13 | 11/01/13 | 11/08/13 | 11/15/13 | 11/22/13 | 11/29/13 | 12/06/13 | 12/13/13 | 12/20/13 | 12/27/13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $ | 175,000 | 125,000 | 150,000 | 175,000 | 150,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 150,000 | 175,000 | 175,000 |
| $ | **175,000** | **125,000** | **150,000** | **175,000** | **150,000** | **125,000** | **125,000** | **125,000** | **125,000** | **125,000** | **125,000** | **150,000** | **175,000** | **175,000** |

| | 09/27/13 | 10/04/13 | 10/11/13 | 10/18/13 | 10/25/13 | 11/01/13 | 11/08/13 | 11/15/13 | 11/22/13 | 11/29/13 | 12/06/13 | 12/13/13 | 12/20/13 | 12/27/13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $ | 45,000 | 62,000 | 45,000 | 62,000 | 45,000 | 56,000 | 28,000 | 45,000 | 28,000 | 45,000 | 28,000 | 45,000 | 28,000 | 45,000 |
| $ | 21,750 | 15,000 | 21,750 | 12,600 | 20,800 | 12,600 | 18,560 | 7,840 | 12,600 | 7,840 | 12,600 | 7,840 | 12,600 | 7,840 |
| $ | 950 | 485 | 950 | 485 | 950 | 485 | 750 | 350 | 750 | 350 | 750 | 350 | 750 | 350 |
| | | | | | 30,000 | | | | | | | | | |
| | | | | 8,150 | | | | 8,150 | | | | | 8,150 | |
| $ | | 1,250 | 2,500 | 4,250 | 100 | 1,250 | 2,500 | 4,250 | 100 | | 1,250 | 2,500 | 4,250 | 100 |
| $ | 11,000 | | 4,000 | | | 11,000 | | | | | | | | 11,000 |
| $ | 10,640 | 1,100 | | | 16,803 | 900 | | | | | 900 | | | 8,640 |
| $ | 3,650 | 3,290 | 2,825 | 1,155 | 10,640 | 3,290 | 2,825 | 1,155 | 8,640 | | 3,290 | 2,825 | 1,155 | 3,630 |
| | | | | | 3,630 | | | | 3,630 | | | | | |
| $ | | 5,000 | | 5,000 | | 5,000 | | | | 5,000 | 275 | | 5,000 | |
| $ | | 275 | | | | 275 | | | | | | | | |
| $ | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,000 | 3,000 | 2,500 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| $ | **96,470** | **91,900** | **80,525** | **97,140** | **131,423** | **96,300** | **59,135** | **69,745** | **56,230** | **60,190** | **49,065** | **63,515** | **61,905** | **78,560** |
| $ | 78,530 | 33,100 | 69,475 | 77,860 | 18,577 | 28,700 | 65,365 | 55,255 | 68,780 | 64,810 | 75,935 | 86,485 | 113,095 | 96,440 |
| $ | 66,500 | 47,500 | 57,000 | 66,500 | 57,000 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 47,500 | 57,000 | 66,500 | 66,500 |
| $ | 12,030 | (14,400) | 12,475 | 11,360 | (38,423) | (18,800) | 18,365 | 7,755 | 21,280 | 17,310 | 28,435 | 29,435 | 46,595 | 29,940 |
| $ | (216,689) | (231,089) | (218,614) | (207,254) | (245,677) | (264,477) | (246,112) | (238,357) | (217,077) | (199,767) | (171,332) | (141,847) | (95,252) | (65,312) |